MICROSOFT CORPORATION,
Plaintiff,

v.

ACTION SOFTWARE,
et al., Defendant.

No. 1:00CV00932.

United States District Court,
N.D. Ohio,
Eastern Division.

March 13, 2001.

David C. Weiner, Elisabeth Welch Andrews, Michael J. Garvin, Hahn, Loeser & Parks, Cleveland, OH, Felicia J. Boyd, Faegre & Benson, Minneapolis, MN, Kathleen O. Peterson, Preston Gates & Ellis, Irvine, CA, Stephen Smith, Preston Gates & Ellis, Seattle, WA, for Microsoft Corp.

Christopher B. Fagan, Richard M. Klein, Steven M. Auvil, W. Scott Harders, Fay, Sharpe, Beall, Fagan, Minnich & McKee, Cleveland, OH, for Action Software, Alexander Belfer.

Alexander Belfer, Eastlake, OH, pro se.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiff, Microsoft Corporation, brings this action against defendant, Action Software, asserting claims for copyright and trademark infringement and common law and statutory unfair competition, and asking for damages, injunctive relief, a constructive trust and an accounting. In its counterclaim, Action Software seeks a declaratory judgment that defendant is not infringing Microsoft's copyright or trademark and asserts its own claim of common law unfair competition. On October 4, 2000, Microsoft filed a Motion for Preliminary Injunction. For the reasons set forth below, that Motion is **DENIED.** (Docket no. 25).

In its Motion for Preliminary Injunction, Microsoft originally sought an order enjoining Action from acquiring, selling, or distributing any "unauthorized" Microsoft software, including both counterfeit software and software which, though manufactured by Microsoft itself, had not been authorized for resale. As to this later category, Microsoft focused on Action's sale of Microsoft Fulfillment Software.[1] This Court held a hearing on October 12, 2000, during which both sides presented evidence. The parties were given the opportunity to submit post-hearing briefs, which they did.

Thereafter, the parties informed the Court that they were attempting to work out their differences and that they were contemplating an agreed dismissal of those claims relating to the sale of Microsoft Fulfillment software—the claims upon which the Court understood Microsoft's Motion for Preliminary Injunction were primarily premised. On January 22, 2001,

---

1. In most packages of software intended to be sold to an end-user, Microsoft includes a license, on a piece of paper, that provides that the end-user may install the software onto one computer and use it under the agreed-upon terms. Microsoft also distributes software without a paper license, called and marked "Worldwide Fulfillment" or "Microsoft Easy Fulfillment," [hereinafter called "Fulfillment software"]. Fulfillment software is intended for business customers with a pre-existing volume license—a license that allows the business to install Microsoft software on all of its computers. Microsoft asserts that this software is not intended for retail sale and that its Fulfillment software customers are informed of this fact.

Microsoft submitted an unopposed Motion to Voluntarily Dismiss its cause of action of Trademark Infringement based on Defendants' Distribution of Microsoft's Fulfillment Software. Microsoft's Motion to Dismiss the Fulfillment portion of its cause of action for trademark infringement was **GRANTED,** (docket no. 49), thereby rendering moot that portion of Microsoft's pending motion for preliminary injunctive relief and rendering irrelevant all evidence submitted on that issue.

At that point, the parties asked that the Court conduct a settlement conference to help them resolve their remaining differences. The Court did conduct a settlement conference on March 2, 2001, but it is clear that the parties remain far apart in their assessment of an appropriate settlement value for this case and, more importantly, of the legal meaning of the facts developed during the course of discovery. Given these fundamental differences, the Court concluded, and the parties agreed, that the parties' time would be best spent preparing to present those differences to a jury. Accordingly, the Court concluded the settlement conference by setting this matter for trial on July 23, 2001.

Despite Microsoft's withdrawal of its claims based on Fulfillment Software, Microsoft's Motion for Preliminary Injunction, through greatly narrowed in scope, remains pending. For the reasons stated below, Microsoft's Motion for a preliminary injunction is **DENIED.** On October 4, 2000, Microsoft filed a motion to dismiss count II of defendant's amended counter-claims. That motion is also **DENIED.** (Docket no. 26).

## I. BACKGROUND

Microsoft creates and manufactures software. Microsoft has created such programs as Windows 95, Windows 98, Windows NT Server 4.0, Microsoft Office 97 and 2000, which include Microsoft Access, Microsoft Excel, Microsoft Outlook, Microsoft PowerPoint, and Microsoft Word. Microsoft has registered trademarks for each of these programs, and secured copyrights for its intellectual property. Action Software is a broker of software, and often deals in Microsoft software. It is not an "authorized" Microsoft dealer in the sense that it does not have a distribution agreement directly with Microsoft.

On April 11, 2000, Microsoft filed the complaint in this action. On October 4, 2000, Microsoft asked this Court for a preliminary injunction against Action. Microsoft contends Action was selling counterfeit software—that is, software that Microsoft did not manufacture, but which appeared to be and was held out to be Microsoft merchandise.[2] Microsoft asked the Court to enjoin Action from "(1) acquiring, distributing, offering for distribution, circulating, offering for sale, advertising, moving, disposing of, destroying, displaying, or making any other use of counterfeit and unauthorized Microsoft Software or components protected by Microsoft's registered copyrights and trademarks, and (2) moving, disposing of, or destroying any business records, whether

---

**2.** The Court takes the time to define "counterfeit" because there has been some blurring in this case as to what the word encompasses. Microsoft has, at times, alleged that any software sold without a genuine Microsoft paper license, or that Microsoft does not authorize for sale, is "counterfeit" software—even though that software was actually created and manufactured by Microsoft. The Court defines "counterfeit" more narrowly, using its dictionary definition; "counterfeit" properly is that which is "made in imitation with intent to deceive." Random House College Dictionary, 1st Ed. p. 306(1980). In other words, counterfeit software meant to look and perform like Microsoft software, but not actually designed, manufactured or created by Microsoft.

on paper or electronic media, that relate to either the counterfeit or unauthorized Microsoft Software components." *See* Plaintiff's Motion for Preliminary Injunction, docket no. 25 p. 1. Although Microsoft originally asked that the Court enjoin Action from making any infringing use of any "unauthorized Microsoft Software," Microsoft has now made clear that it is only seeking, at this stage, to enjoin Action from selling counterfeit software. *See* Pre. Inj. Tr. pp. 191–192; Motion to Voluntarily Dismiss claims premised on Sale of Fulfillment Software. In addition, because Action agreed during the hearing that it would not destroy any records related to its sales of Microsoft software, Microsoft accepted this representation, made by counsel and Action, and agreed that an injunction prohibiting Action from disposing of its business records is unnecessary.

On October 12, 2000, this Court held a preliminary injunction hearing. Through the testimony of Tamara Sellers, a paralegal employed by Microsoft, Microsoft asserts that Action, three years ago, sold one piece of counterfeit software at a computer fair. Microsoft did not move to have that single piece of counterfeit software admitted into evidence. Microsoft also asserts that, during a raid of another software broker, it came across both counterfeit software (as the Court defines it here) and invoices from Action showing Action sold merchandise to this rogue broker. Microsoft conceded, however, that, to date, it has no evidence linking the Action invoices to the counterfeit items. In other words, the Action invoices could be linked to non-counterfeit items sold by the rogue broker. Microsoft did not establish the existence of any recent counterfeit sales by Action, nor did it proffer evidence of any offers to sell counterfeit items in the future.

Action asserts, through Action employees Alexander Belfer and Samantha Bel-fer, that it had one independent contractor who, several years ago, apparently sold limited amounts of counterfeit software while also selling software for Action. Action asserts that this individual did not sell counterfeit software on Action's behalf and that any such sales were in contravention of Action's own policies and directions with respect to the transfers of counterfeit software. Action's principals testified, without contradiction, that, when they became aware that this seller was dealing in counterfeit goods, they ceased all dealings with her.

The owners of Action also both testified that they took care not to sell counterfeit goods by examining samples of all merchandise received from a new supplier. The Action owners testified that the sale of counterfeit goods would greatly jeopardize their business dealings with their own customers, and that they had no intention of selling counterfeit goods, either now or in the future. Action asserts that it sells Microsoft software exactly as it receives it from its suppliers, wrapped in plastic in a jewel case, with Microsoft labeling on it, including, at times, labeling prohibiting resale.

## II. PRELIMINARY INJUNCTION STANDARD

When determining whether to issue a preliminary injunction, the Court normally considers four equitable factors, "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998). Because an injunction against infringing

activity is authorized by statute, *see* 17 U.S.C. § 502; 15 U.S.C. § 1116, however, the Court need not consider these equitable factors. Simply fulfilling the requirements of the statute or, in other words, fulfilling the first factor for an injunction to issue—showing a strong likelihood of success on the merits—is all that is needed for the Court to issue an injunction. *See U.S. v. Microsoft Corp.*, 147 F.3d 935, 943 (D.C.Cir.1998) ("It is clear that if a statute confers a right to an injunction once a certain showing is made, no plaintiff, neither governmental agencies nor private parties—need show more than the statute specifies"); *U.S. v. Painesville*, 644 F.2d 1186, 1194 (6th Cir.1981) (holding that district court must, under a statutory injunction, order injunctive relief upon finding of liability without considering irreparable harm). Irreparable harm is, thus, presumed in actions for copyright and trademark infringement. *See Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 101 (2d Cir.1992); *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 525–26 (9th Cir.1984).

## III. FINDINGS OF FACT

 There was no evidence presented at the preliminary injunction hearing indicating that Action is *currently* engaged in the sale of counterfeit software. Microsoft presented evidence of only one sale of counterfeit software, occurring over three years ago; it has not referred to or provided any evidence to support the claim that a continuing or contemporary sale of coun-

terfeit merchandise is occurring or that there is even a meaningful threat that any such sale might occur.[3] On this record, there is no basis upon which this Court could justify entry of a preliminary injunction with respect to the sale of counterfeit software.[4]

## IV. Microsoft's Motion to Dismiss Action's Counterclaim for Unfair Competition.

Microsoft has filed a Motion to Dismiss Action's Counterclaim for Unfair Competition (docket no. 26). Microsoft asserts that Action has failed to state a claim upon which relief can be granted under Rule 12(b)(6) because the tort of unfair competition premised on filing a vexatious lawsuit against a competing business does not exist under Ohio law.

 In this assertion, Microsoft is wrong. Ohio is one of the first states to recognize that lawsuits implemented with the design to gain an unfair advantage over a competing business are a basis for a common law suit for unfair competition. In *Henry Gehring Co. v. McCue*, 23 Ohio App. 281, 154 N.E. 171 (1926), an Ohio court recognized that the tort of unfair competition could include the institution of litigation not brought in good faith, but rather for the purpose of destroying a rival. The Ohio Appellate Court held:

> There is well-established authority for the holding that the pursuit of one competitor by another, either in court or out

---

**3.** At the settlement conference, Microsoft claimed that it has developed substantial circumstantial evidence indicating not only that Action continues to trade in counterfeit goods, but that it does so on a large scale. Microsoft has not asked to supplement the record of the preliminary injunction hearing with this evidence, however, and the Court must limit consideration of the pending motion to the current record. Because the Court's assessment is limited in this way, however, and

because its decision is, by definition, preliminary, the Court's decision here does not presage any ultimate determination on the merits; that will be determined by the record presented to the trier of fact at trial.

**4.** The Court notes, however, that, were the record different, it would not hesitate to prohibit, both preliminarily and permanently, such illegal activity.

of court, for the purpose of injuring him in his business, may result in recovery under sufficient proof. There are numerous cases of successful recoveries because of malicious acts by way of litigation in the courts, where it appears that the litigation was not founded upon good faith, but was instituted with the intent and purpose of harassing and injuring a rival producing and selling the same commodity.

*Id.* In 1984, the Ohio Supreme Court reiterated this holding in *Water Management v. Stayanchi,* 15 Ohio St.3d 83, 472 N.E.2d 715 (1984). In that case, the Court stated:

Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. The concept of unfair competition may also extend to unfair commercial practices such as *malicious litigation,* circulation of false rumors, or publication of statements, all designed to harm the business of another.

*Id.* at 716 (emphasis added).

This tort has been referred to as recently as a few months ago in *Molten Metal Engineering v. Metaullies Systems, Co.,* 2000 WL 739470 (Ohio App.2000), where the court reiterated that the tort of unfair competition includes unfair commercial practices such as malicious litigation. *See also* Robert L. Tucker, Vexatious Litigation as Unfair Competition, and the Applicability of the Noerr–Pennington Doctrine, 22 Ohio N.U. L.Rev. 119 (1995); Trademarks, Tradenames and Unfair Competition, 88 OH Jur.3d Trade Regulation § 66

(1989) ("While unfair competition is commonly defined in terms of the doctrine that no one may sell his goods as those of another, it has come to develop a broader connotation in recent years and so may consist of unethical business practices not necessarily amounting to the passing off of goods or services. Specific examples of this broadening include malicious litigation calculated to injure the business of another . . .").[5]

Microsoft also argues that Action will not be able to prove that Microsoft's conduct fulfills the elements of the tort for unfair competition. This may very well be true. The Court, however, makes no determination at this time about Action's ability to ultimately succeed on this claim.

For these reasons, Microsoft's motion to dismiss count II of defendant's amended counterclaims is **DENIED** without prejudice to reassertion in the context of a Rule 56 motion.

## VI. CONCLUSION.

Microsoft has not shown a likelihood of successfully establishing that Action is currently distributing counterfeit software or that there is an imminent threat that it will do so during the pendency of these proceedings. Accordingly, Microsoft's Motion for a Preliminary Injunction is **DENIED.** (Docket no. 25). As the Court finds that Action has stated a claim upon which relief can be granted in Count II of its Counterclaim, Microsoft's Motion to Dismiss is also **DENIED.** (Docket no. 26). To the extent not clearly reflected on the docket to date,

**5.** In *Baxter Travenol v. LeMay,* 536 F.Supp. 247 (S.D.Ohio 1982), the district court stated that, in order to bring a cause of unfair competition premised on baseless litigation, the litigation filed by the aggressor must have previously concluded in favor of the innocent victim. The Court sees no basis for this limitation in *Gehring,* or any other Ohio case. No other court has read such a requirement into the tort of unfair competition, including the Ohio Supreme Court who recognized this tort two years later. In fact, in *Harco v. Corrpro Co., Inc.,* No 1465, 1986 WL 12338 (Ohio Ct App. Oct. 29, 1986), the Court gave a jury charge on defendant's counterclaim for unfair competition premised on the frivolous nature of the trial in progress.

the Court also confirms that Microsoft's Motion to dismiss, without prejudice, its trademark claim based on defendant's distribution of Microsoft Fulfillment Software is **GRANTED.** (Docket no. 49).

**IT IS SO ORDERED.**