Pfeifer, J.,
concurring in part and dissenting in part.
{¶ 97} I concur in the majority’s judgment affirming the appellate court’s judgment on appellees’ unfair-competition claims. I do not concur in the majority’s determination that a legal action must be objectively baseless to form the foundation of an unfair-competition claim based upon malicious litigation. Further, I dissent from the entirety of the majority’s holding regarding the appellees’ defamation claims and would affirm the judgment of the court of appeals on those claims.
*394 I
Defamation
{¶ 98} The jury carefully considered five separate alleged instances of defamation. Jurors decided that two of those statements were defamatory, that the American Chemical Society (“ACS”) had made those statements with malice, and that defendants had suffered damages. The majority seeks to thwart the jury’s verdict by imposing its own verdict.
Publicity as a Weapon
{¶ 99} On April 11, 2002, Michael Dennis, the senior lawyer at Chemical Abstract Service (“CAS”), called Michael Conley, Leadscope’s chief financial officer, requesting a meeting — a meeting at which ACS would eventually demand Leadscope’s patent and $1 million. Dennis threatened to bring “both [a] civil and criminal complaint” and “fast and furious publicity” if Leadscope refused to meet with ACS. When Leadscope did not accede to ACS’s settlement demands, ACS unleashed its destructive, two-pronged strategy — litigation and publicity. The publicity proved the more devastating.
{¶ 100} A jury spent weeks hearing testimony about Leadscope’s path from innovation to devastation. The jury found that, by far, Leadscope had been harmed the most by the publication of defamatory statements made by ACS. The verdicts and interrogatories are attached to this opinion as an appendix. Even though the jury found that Leadscope had proven claims for tortious interference and unfair competition, nearly 70 percent of the damages awarded by the jury to Leadscope were attributable to the defamatory statements of ACS. For the individual plaintiffs, the jury found that as far as general damages were concerned, Blower, Johnson, and Myatt suffered damages equally from the unfair competition and the defamation.
{¶ 101} It should be no surprise that ACS’s comments about Leadscope and its founders, especially to the particular audiences it chose, were devastating. ACS, a venerable institution chartered by Congress, the world’s largest scientific society with over 164,000 members and self-described as “one of the world’s leading sources of authoritative scientific information,” accused three of its former employees of stealing technology from CAS. The jury, like ACS, realized the import of that type of accusation. That purveyor of “authoritative scientific information” announced to the 1,900 employees of ACS — employees who were colleagues, competitors, and potential customers of Leadscope and its founders— that Leadscope and its founders had “sought and received a patent for technology indistinguishable from a project on which they worked while employees of the Society’s Chemical Abstracts Service” and that ACS would act “to protect its intellectual property and proprietary information.” ACS then admonished the *395 1,900 people that it just notified of the lawsuit to not comment upon it to anyone else.
{¶ 102} Ten days later, ACS ignored its own advice and spoke, through its attorney, to Columbus’s Business First, a business-oriented newspaper. To a reporter from the business newspaper of Leadscope’s home town, a town where Leadscope had been attempting to raise capital, ACS essentially said that Leadscope’s central product was stolen from ACS.
{¶ 103} ACS, “one of the world’s leading sources of authoritative scientific information,” announced to an audience that included the scientific world and the financial world that virtually everything that Leadscope was built upon was stolen. A few words to the right audience can be ruinous. And the jury determined that those words were ruinous to Leadscope, Blower, Johnson, and Myatt. The majority.has not demonstrated why those jury verdicts should not stand.
Legal Standard
{¶ 104} The law on defamation is not complicated. As the majority relates, defamation occurs when a publication contains a false statement made with some degree of fault that reflects injuriously on a person’s reputation or affects a person adversely in his trade, business, or profession. Jackson v. Columbus, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9. The majority, however, finds that the statements made by ACS are not defamatory, despite the fact that the claims of Leadscope and the individual defendants were not wanting as to any element necessary to prove defamation. And the majority does not assert that any privilege applies to ACS. In both instances — the employee memorandum and the Business First article — the statements made by ACS were false, were made with the knowledge that they were false, injured the reputations of Leadscope and the individual defendants, and adversely affected them in their business.
A
Business First Article
{¶ 105} The jury awarded damages based on a statement from ACS’s counsel in the May 11, 2002 edition of Business First. The statement reads, “Our motivation in filing suit is to acquire back the protected information that they took from us.” ACS’s counsel demonstrated no equivocation. He did not claim to be quoting the complaint. He said that the defendants had taken protected information from ACS. That statement was false, ACS knew it was false, and it injured Leadscope and the individual defendants. The majority concocts novel legal theories to save ACS from the jury’s verdict.
*396 1. ACS Is Not a Newspaper
{¶ 106} The majority cites four cases involving newspapers as defendants in support of its statement that a court must review the statement at issue under the totality of the circumstances and within context: Mann v. Cincinnati Enquirer, 1st Dist. No. C-09074, 2010-Ohio-3963, 2010 WL 3328631, ¶ 12, citing Scott v. News-Herald, 25 Ohio St.3d 243, 253, 496 N.E.2d 699 (1986); Mendise v. Plain Dealer Publishing Co., 69 Ohio App.3d 721, 726, 591 N.E.2d 789 (1990); and Connaughton v. Harte Hanks Communications, Inc., 842 F.2d 825, 840 (6th Cir.1988), aff'd 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Those cases actually say that the court must look to the entire “article” — the majority substitutes the word “publication” — to determine whether the statements at issue are defamatory. That is, when a newspaper is being sued for statements appearing in an article, the court should look at everything the newspaper published in the article in determining whether the statements at issue were defamatory. The newspaper, when it is being sued, gets credit for its attempt to balance the allegedly defamatory statements with other material. In discussing context, the court in Scott said:
To evaluate an article’s broader context we must examine the type of article and its placement in the newspaper and how those factors would influence the reader’s viewpoint on the question of fact or opinion.
Scott v. News-Herald at 253. ACS was not making editorial decisions. It was simply making defamatory statements.
{¶ 107} The majority cites newspaper cases that simply do not apply to ACS. For instance, the majority quotes Connaughton as saying, “[T]he words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.” Id. at 840.
{¶ 108} When one views that quote as part of the entire sentence as it appeared in Connaughton, it is clear that the case is discussing the newspaper’s entire process in putting a story to print:
Other factors to be scrutinized are conversations between the editor and/or other management personnel with reporters, or the author of the article, concerning the research and development of a controversial story; decisions and reasons relating to selective interviews and selective investigations; the manner of implementing interviews; the importance and *397 veracity of information relied upon in developing the article, always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire article and the thoughts that the article through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.
Id. at 840.
{¶ 109} Business First is not being sued here. If it were, Business First would get credit for the “balanced report of both parties’ arguments and defenses” that the majority claims Business First gave. ACS, on the other hand, is responsible for its lawyer’s words. Business First reported what ACS’s counsel said; ACS does not get the benefit of the nonparty newspaper’s attempt at writing a balanced story.
2. The Defamed Party’s Opportunity to Deny the Defamatory Statement Does Not Make the Statement Nondefamatory
{¶ 110} The majority states that the Business First article “contained a balanced report of both parties’ arguments and defenses.” The majority excuses ACS’s defamatory statement because it was balanced by Leadscope’s assertion in the article that the lawsuit “has no merit.” This is a novel approach to defamation law — if the victim denies the defamatory statement, the defamer is shielded from liability because the statement is not defamatory. Does the majority really mean that?
{¶ 111} It may be the case that the chance to publicly deny the veracity of a defamatory statement might affect the amount of damages a plaintiff may recover. But the opportunity to defend one’s good name cannot mean that the defamatory statement itself was not defamatory. It just cannot.
3. A Statement About Litigation Is Qualifiedly Privileged
{¶ 112} Parties to a lawsuit are protected from claims of defamation related to discussions about that lawsuit — but it is a qualified privilege. This privilege is codified at R.C. 2317.05 and provides that a “fair and impartial report” of the allegations made in a lawsuit is protected by a qualified privilege that can be overcome by a showing of actual malice. The fact that a statement accurately reports the contents of litigation does not render the statement “not defamatory”- — it only entitles the speaker to a qualified privilege, which can be overcome by a showing of actual malice.
{¶ 113} The jury was instructed that ACS’s comments in Business First were qualifiedly privileged in this case. The jury was also instructed that actual malice occurs “when the [declarant] makes a false statement either with knowledge that it is false or with reckless disregard of whether it is false or not.”
*398 {¶ 114} The jury found that ACS, through its counsel, had made with actual malice the statement alleging that defendants had stolen something from ACS. That was enough to overcome the privilege that applies to statements regarding litigation in Ohio.
4. Client Authorization or Ratification
{¶ 115} The majority’s discussion of a client’s vicarious liability for the statements of its attorney is superfluous, given its holding that the statements made by ACS’s attorneys were not defamatory. That discussion is also superfluous because it has nothing to do with this case. ACS makes no claim that it had not authorized or ratified the statements of its attorney in the Business First article. Instead, it attempted to persuade this court in its briefing that the statements were fair commentary on the lawsuit, that the “statements at issue * * * stay well within the allegations made in the complaint, and it is in fact difficult to envision an ‘accurate summary of the allegations’ that would be more restrained.” Can we not presume that ACS ratified or authorized the statements in the complaint? Should this court reverse a $15 million verdict on a theory not raised by the appellant at trial or on appeal, a theory that would have been dismissed by the jury out of hand?
(¶ 116} Ohio attorneys would have nothing to fear from a holding in favor of appellees. Attorneys should note well that they may speak out about a pending lawsuit with no threat of liability as long as they do not make a false statement either with knowledge that it is false or with reckless disregard of whether it is false or not. They retain an absolute privilege for whatever they file or say in court, Willitzer v. McCloud, 6 Ohio St.3d 447, 448-449, 453 N.E.2d 693 (1983), but they cannot expect to avoid liability for lying in public just because they first have lied in a complaint.
B
Memorandum to Employees
{¶ 117} ACS’s memorandum to all its employees regarding the litigation was the second basis upon which the jury found that ACS had defamed the defendants. The memorandum (which reads more like a press release) was sent to approximately 1,900 employees around the globe, including Europe and Asia, including employees having nothing to do with the case. It read:
Re: Communication re: Legal Matter

The nonprofit American Chemical Society has filed a legal complaint against Leadscope, Inc., and its founders, who sought and received a patent for technology indistinguishable from a project on which they 
*399
worked while employees of the Society’s Chemical Abstracts Service in the mid-1990s.

The Society is a leader in publishing scientific journals and databases that are indispensable to chemists around the globe, and is acting to protect its intellectual property and proprietary information.
Staff members are not authorized to comment on this matter. It is important that you refrain from communicating and/or commenting about this subject to any individual while the legal process is being pursued.
(Emphasis added.)
{¶ 118} ACS, which had threatened “fast and furious publicity,” released this memo to people in the same industry as defendants, alleging that defendants had sought their patent fraudulently. The statement that Leadscope and its founders had “received a patent for technology indistinguishable from a project on which they worked while employees of the Society’s Chemical Abstracts Service” was false, ACS knew it was false, and it injured Leadscope and the individual defendants.
{¶ 119} The majority goes along with the fiction that “[t]he internal memorandum was simply a directive to all employees from ACS’s counsel to not speak about the litigation.” Could it instead have been an effort to get as many people in the industry talking about the lawsuit as possible?
{¶ 120} Regardless, the majority states that “[cjonsidering the memorandum as a whole and considering the fact that the statements in the memorandum were almost a verbatim recitation of the allegations in the complaint, we hold that the statements are not defamatory.” Majority opinion at ¶ 80. To the contrary, a consideration of the memorandum as a whole does nothing but lead to a conclusion that the memorandum is defamatory. Nothing in the remainder of the memorandum softens the salvo from the opening paragraph that defendants’ product’s technology was indistinguishable from that of a project they worked on at CAS. There is nothing saying “we allege” or “we think” — the reader is led to believe that ACS has compared the guts of the two projects and found they were identical, that ACS’s only option is to go to war because of what it has found. The jury determined that was not true.
{¶ 121} That the memorandum went to employees and involved litigation was relevant, but not determinative. Again, ACS enjoyed a qualified privilege for the statements made in the memorandum. But a falsehood contained in a legal complaint when repeated outside of that complaint does not enjoy an absolute privilege.
*400 {¶ 122} This jury found that ACS had acted with actual malice in the publication of the employee memorandum. Again, the majority ignores the jury’s determination.
C
Conclusion on Defamation
{¶ 123} ACS levied the most serious accusation that can be brought against an inventor: you stole your invention. For the majority to determine that those words are not defamatory is unfathomable. This is not an instance where a court has been asked to determine whether a statement is simply rhetoric, satire, or hyperbole and thus not defamatory. There is no way to paint the comments at issue in this case as anything other than defamatory. There is no privilege extensive enough to protect ACS from liability for those statements. The statements were well chosen, well timed, and well placed by ACS to achieve their maximum effect. Leadscope and its founders were profoundly damaged. But ACS pays no price for its defamatory statements because they were more or less reflective of statements contained in its complaint. The majority excuses ACS for its published lies to the scientific community and financial community because it had first lied to a federal court. Such is the reasoning when a result goes in search of a justification.
II
Unfair Competition Based upon Malicious Litigation
{¶ 124} I concur in the majority’s holding that the appellees proved their case for unfair competition based upon malicious litigation even under the standard of law that the majority says should have been in place in this case. I do not concur with the majority that under Ohio law, the Noerr-Pennington doctrine establishes the elements of a claim for unfair competition based upon malicious litigation. See E. RR. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585,14 L.Ed.2d 626 (1965).
A
Unfair Competition
{¶ 125} First, I would hold that this court need not even address ACS’s appeal regarding malicious litigation. The individual defendants and Leadscope alleged that ACS had engaged in unfair competition through three means: malicious litigation, circulation of false statements and rumors about the defendants, and false disparagement of individual defendants. The jury returned a general *401 verdict against ACS in favor of all the defendants; a jury interrogatory asked on which grounds the jury had found for the defendants on the unfair competition issue. The jury answered that ACS had engaged in unfair competition in each of the three separate ways the defendants had alleged. In the award of damages for the unfair-competition claims, there was no breakdown as to how much the jury awarded under each theory.
Two-Issue Rule
{¶ 126} This court in Water Mgt, Inc. v. Stayanchi, 15 Ohio St.3d 83, 85, 472 N.E.2d 715, 717 (1984), recognized that “[t]he concept of unfair-competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another.” This court cited Henry Gehring Co. v. McCue, 23 Ohio App. 281, 283-284, 154 N.E. 171 (8th Dist.1926) in support of that statement. The majority opinion addresses only the malicious litigation aspect of the defendants’ unfair-competition claims; it does not address the claims and jury verdicts for the defendants that were based upon circulation of false statements and rumors about defendants or false disparagement of individual defendants. The trial court provided separate instructions for those claims, and the jury made discrete findings as to each and recorded those findings in its answer to an interrogatory.
{¶ 127} Due to the two-issue rule, there is no need for this court to even address the malicious-litigation portion of defendants’ unfair-competition claims. Under the two-issue rule, if there is a general verdict and more than one theory of liability, the verdict stands if one of the theories of liability was tried without error:
This rule as generally applied is that, where there are two causes of action, or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party, it will be presumed that all issues were so determined; and that, where a single determinative issue has been tried free from error, error in presenting another issue will be disregarded.
HE. Culbertson Co. v. Warden, 123 Ohio St. 297, 303,175 N.E. 205 (1931).
{¶ 128} Here, we do not even have two separate causes of action; instead, the jury was presented with three ways it could find that ACS had engaged in unfair competition. The jury found in favor of the defendants on three variations of the same tort. That an error was alleged as to one of those theories is irrelevant *402 under the two-issue rule. According to the jury, ACS was liable to the defendants for unfair competition. The general damages verdict on unfair competition was not tested by interrogatories. Even if the malicious-litigation aspect of defendants’ claim were reversed, the general verdict remains, supported by the remaining findings of unfair competition. The jury verdict on unfair competition should therefore stand regardless of this court’s decision on the malicious-litigation issue.
B
Malicious Litigation
1. ACS Waived Noerr-Pennington Immunity and Thus Any Requirement That the Defendants Prove ACS’s Claims Were “Objectively Baseless”
{¶ 129} The majority opinion states that in this case, “the jury instructions were inadequate because they did not include the ‘objectively baseless’ element necessary to meet the two-part test for an unfair competition claim.” But no Ohio case has ever required that the litigation brought by a malicious-litigation defendant be “objectively baseless.” See, e.g., Henry Gehring Co. v. McCue, 23 Ohio App. at 283-284, 154 N.E. 171; Harco Corp. v. Corrpro Cos., Inc., 9th Dist. No. 1465, 1986 WL 12338, *3 (Oct. 29, 1986); Microsoft Corp. v. Action Software, 136 F.Supp.2d 735, 739 (N.D.Ohio 2001). The majority’s statement about a “two-part test for an unfair competition claim” demonstrates a fundamental misunderstanding.
{¶ 130} As the majority relates, those magic words — “objectively baseless”— come from Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. (“PREI ”), 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), a case applying the Noerr-Pennington Doctrine. PREI, however, does not establish a two-part test for malicious prosecution. Rather, it establishes a two-part test for defeating a claim of Noerr-Pennington immunity. “[T]he Noerr-Pennington doctrine, as it has evolved, is an affirmative defense which exempts from antitrust liability any petitioning activity designed to influence legislative bodies or governmental agencies.” North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 666 F.2d 50, 52 (4th Cir.1981). ACS seeks to extend NoerrPennington immunity in this case to make it immune from liability for filing suit against the defendants.
{¶ 131} PREI establishes that a party claiming immunity may still be liable if the suit at issue constituted “sham litigation.” Under PREI, litigation cannot be deprived of immunity as a sham unless it is objectively baseless. PREI at 60.
*403 {¶ 132} Parties claiming immunity from liability pursuant to the NoerrPennington Doctrine must raise that alleged immunity as an affirmative defense. Bayou Fleet, Inc. v. Alexander, 234 F.3d 852, 860 (5th Cir.2000). Once the malicious-litigation defendant “assert[s] Noerr-Pennington as an affirmative defense, [the plaintiff] ‘has the burden of proving that its [opponent’s] conduct was a sham.’ IGEN Internatl., Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 312 (4th Cir.2003), quoting Hosp. Bldg. Co. v. Trustees of Rex Hosp., 791 F.2d 288, 293 (4th Cir.1986).” However, ACS never asserted that it had NoerrPennington immunity from liability in this action. Thus, defendants were under no burden to establish that ACS’s claims constituted sham litigation under PREI.
{¶ 133} Since Noerr-Pennington immunity is an affirmative defense, ACS was bound by Civ.R. 8(C) (affirmative defenses) to plead it in a responsive pleading. Of course, it did no such thing. It waived the defense; ACS did not even mention objective baselessness or the Noerr-Pennington Doctrine until its motion for judgment notwithstanding the verdict, two weeks after the conclusion of the trial. Now, after ignoring PREI, a United States Supreme Court case decided nearly a decade before this litigation started, ACS wants to retroactively make it control this case.
2. The Noerr-Pennington Doctrine Is Not a Part of Ohio Unfair-Competition Law
{¶ 134} What ACS failed to assert as an affirmative defense — Noerr-Pennington immunity — it now seeks to shoehorn in as necessary proof of a claim for unfair competition. ACS was thus left to claim to this court that objective baselessness has always been a part of malicious-litigation law in Ohio.
{¶ 135} But it has never been a part of malicious-litigation law in Ohio. Greer-Burger v. Temesi, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, is by no means an unfair-competition case and is inapposite. In Greer-Burger, at paragraph two of the syllabus, this court applied the sham litigation analysis from PREI to determine that the government, specifically the Ohio Civil Rights Commission (“OCRC”), could not prevent an employer from suing an employee over damages the employer suffered from the employee’s unsuccessful discrimination claim. In Greer-Burger, the employer was prevented by an order of the OCRC from even bringing his claim; he was actually denied access to the courthouse. Id. at ¶ 16. ACS, on the other hand, has not been prevented from seeking redress against the defendants. It had its day in court. It wants something completely different — to be held harmless for any damage it may have caused defendants by bringing its claims.
{¶ 136} The test for sham litigation in PREI arises once a party claims immunity from liability. It is not a part of a test for malicious litigation. That is why ACS never raised it below. That is why we should not apply it in this case.
*404 c
Conclusion on Unfair Competition Based upon Malicious Litigation
{¶ 137} Although I do not agree with the majority that PREI, a case not raised by ACS until after the conclusion of the trial, controls the law in Ohio on unfair competition based upon malicious litigation, I do agree with the majority that defendants proved that ACS’s claims were objectively baseless under that standard and that the jury verdicts on appellees’ unfair-competition claims should stand. Thus, I concur in the majority’s decision affirming the judgment of the court of appeals on appellees’ unfair-competition claims.