[Cite as *Key Realty, Ltd. v. Hall*, 2021-Ohio-1868.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Key Realty, Ltd.                               Court of Appeals No. L-19-1237

    Appellant                              Trial Court No. CI0201901132

v.

Michael Hall, et al.                           **DECISION AND JUDGMENT**

    Appellees                              Decided:  June 1, 2021

* * * * *

Gregory H. Wagoner and Nicholas T. Stack, for appellant.

David A. Nacht, for appellee Michael Hall.

Roman Arce, for appellees Heather Hall, Kenton Fairchild, and
Red 1 Realty, LLC.

* * * * *

**MAYLE, J.**

{¶ 1} This case is before the court upon a motion filed by plaintiff-appellant, Key

Realty, Ltd., asking that we reconsider, or consider en banc, our decision in *Key Realty,*

*Ltd. v. Hall*, 6th Dist. Lucas No. L-19-1237, 2021-Ohio-26 (*Key Realty I*).  Defendants-

appellees, Michael Hall, Red 1 Realty, LLC, Heather Hall, and Kenton Fairchild, have

jointly filed a brief in opposition to the motion. For the following reasons, we grant Key Realty's motion for reconsideration and vacate our decision in *Key Realty I*. We deny as moot its motion for consideration en banc.

## I. Procedural Background

{¶ 2} Key Realty, Ltd. ("Key Realty"), filed a complaint against Michael Hall ("Hall"), Red 1 Realty, LLC, Heather Hall ("Heather"), and Kenton Fairchild for trade secret misappropriation (Count 2), unfair competition (Count 3), tortious interference with business relations (Count 4), tortious interference with contract (Count 5), breach of fiduciary duty (Count 6), conversion (Count 7), unauthorized use of computer, cable or telecommunication property (Count 8), criminal mischief (Count 9), civil theft (Count 10), spoliation (Count 12), and civil conspiracy (Count 13). As against Hall only, it also alleged breach of a Non-Competition, Non-Solicitation, and Confidentiality Agreement ("the agreement") (Count 1) and extortion (Count 11). Appellees moved for summary judgment on all of Key Realty's claims. In a judgment journalized on October 15, 2019, the trial court granted Hall's motion for summary judgment on all counts except Count 1—which it denied, in part—and granted the remaining appellees' motion for summary judgment on all counts applicable to them.

{¶ 3} Key Realty appealed and assigned the following errors:

> I. The trial court committed reversible error when it dismissed Key Realty's claim that Michael Hall violated the confidentiality provision in his agreement.

2.

II.  The trial court committed reversible error when it dismissed Key Realty's trade secret claim.

III.  The trial court committed reversible error when it dismissed Key Realty's unfair competition claim.

IV.  The trial court committed reversible error when it dismissed Key Realty's tortious interference with business relations and contract claims.

V.  The trial court committed reversible error when it dismissed Key Realty's conversion claim.

VI.  The trial court committed reversible error when it dismissed Key Realty's unauthorized use of computer property, criminal mischief, civil theft and extortion claim.

VII.  The trial court committed reversible error when it dismissed Key Realty's spoliation claim.

VIII.  The trial court committed reversible error when it dismissed Key Realty's civil conspiracy claim.

IX.  The trial court committed reversible error when it dismissed Key Realty's breach of fiduciary duty claim against Mike Hall.

{¶ 4} In a 2-1 decision, we affirmed the judgment of the Lucas County Court of Common Pleas, dismissing Key Realty's claims for breach of the confidentiality provision of the Agreement and Counts 2 through 13.  Although not raised by appellees

3.

as error on appeal, we also reversed the trial-court judgment denying summary judgment to Hall on Key Realty's remaining claims for breach of the Agreement, holding that the agreement was unenforceable for lack of consideration.

{¶ 5} Key Realty filed this motion for reconsideration and consideration en banc. It argues as follows:

The Majority's Conclusion that the Agreement is unenforceable, as a matter of law, for lack of "proper" consideration should be reconsidered and reversed.

The Majority's conclusion that Key Realty's tortious interference with contract claim fails as a matter of law should be reconsidered and reversed.

The Majority's conclusion that Key Realty's claim for tortious interference with business relations fails as a matter of law should be reconsidered and reversed.

The Majority's conclusion that Key Realty's breach of fiduciary duty claim fails as a matter of law should be reconsidered and reversed.

The Majority's conclusion that Key Realty's conversion claim fails as a matter of law should be reconsidered and reversed.

The Majority's conclusions that Key Realty's claims of civil liability for [unauthorized use of computer property, civil theft, and extortion] fail as a matter of law should be reconsidered and reversed.

4.

The Majority's conclusion that Key Realty's claim for civil conspiracy fail[s] as a matter of law should be reconsidered and reversed.

The Majority's conclusion that Key Realty's claim for spoliation against Heather Hall fails as a matter of law should be reconsidered and reversed.

The Majority's conclusion that Key Realty's claim for unfair competition fails as a matter of law should be reconsidered and reversed.

## II. Factual Background of this Dispute

{¶ 6} Before addressing Key Realty's arguments, we recite the facts of this case as explained in the dissenting opinion in *Key Realty I* because the facts as set forth in the majority opinion in *Key Realty I* were incomplete and failed to reference or include key facts relevant to the issues addressed therein.

{¶ 7} Hall began his real estate career as an agent working for Golden Gate Real Estate as an independent contractor, where he worked for approximately four years. During that time, he was also employed by Old Republic Home Warranty as a home warranty representative. In 2010, Hall left Golden Gate and became a real estate agent for Key Realty, which was owned by Dennis Degnan and his wife, Amy Saylor. At that time, Hall continued in his employment with Old Republic while working as a realtor for Key Realty as an independent contractor.

{¶ 8} Hall terminated his employment with Old Republic in "2011 or '12" because he "was moving into a different role within Key Realty" at that time. That is, "sometime

5.

around 2012," Hall transitioned into a management role at Key Realty and began overseeing agents. Over the years that followed, Hall's work for Key Realty continued to grow, and he was eventually promoted to director.

{¶ 9} At all times, Hall worked for Key Realty as an independent contractor. As an independent contractor, he did his work for Key Realty through Key Realty Columbus 1, LLC ("Key Columbus"), a limited liability company that he owned.

## A. The Non-Competition, Non-Solicitation, and Confidentiality Agreement

{¶ 10} On December 12, 2012, Hall signed a Non-Competition, Non-Solicitation, and Confidentiality Agreement with Key Realty. The parties dispute the circumstances surrounding the execution of the agreement.

{¶ 11} Hall claims that he signed the agreement because Degnan promised him a "future ownership" interest in Key Realty over the course of "two to three" conversations in 2012. Degnan, however, flatly denied this. He testified:

> That's ridiculous, okay? Why would – this is someone who had no
>
> track record as manager, whatsoever. * * * Why would I give somebody an
>
> offer of ownership in a company? He was untested as a manager. He had
>
> no track record, whatsoever, in real estate management. So the idea that I
>
> had conversations with him about ownership in 2012 are simply not true.

{¶ 12} The written agreement does not contain any promises of "future ownership" in Key Realty. The agreement is a form contract, and it is couched in terms of an employer/employee relationship—referring to Hall as "Employee" and Key Realty

6.

as "Employer"—even though Hall always worked for Key Realty as an independent contractor. The relevant provisions of the agreement can be summarized as follows:

- *WHEREAS clause*: Hall is employed "in a position of trust and confidence, requiring a high degree of loyalty, honesty and integrity" and he "has gained and will continue to gain valuable information and insights on the lines of business in which Employer is engaged; access to Employer's confidential and proprietary information; and exposure to its existing and potential business opportunities";

- *WHEREAS clause*: Hall has accepted his "present position" with the understanding that he "is not to use or divulge any such matters" for his own "personal gain or to the detriment of Employer";

- *Paragraph 1, "TERM"*: The agreement is effective during his employment and for two years after the termination of his employment with Key Realty "for any cause or reason";

- *Paragraph 2, "COVENANT NOT TO COMPETE"*: During his employment, Hall could not, directly or indirectly, compete with Key Realty or "be connected in any like manner with any other business" similar to Key Realty within a 30-mile radius of his principal place of employment;

- *Paragraph 3, untitled*: After the termination of his employment, Hall could not, directly or indirectly, compete with Key Realty within a fifty-mile radius

of his principal place of employment or "be connected in any like manner with any other business" similar to Key Realty;

- *Paragraph 4, NO DISCLOSURE OR SOLICITATION OF CUSTOMERS*:  Hall could not, directly or indirectly, divulge the names or addresses of any customers of Key Realty unless in response to a subpoena or court order;

- *Paragraph 5, NO SOLICITATION OF EMPLOYEES*:  Hall could not, directly or indirectly, "solicit or cause any person under his/her control to solicit any employee of Employer, to terminate his/her employment relationship with Employer";

- *Paragraph 6, INFORMATION*:  Hall could not, during the term of the agreement, "in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature or description concerning any matters affecting or relating to the business of Employer"; and

- *Paragraph 7, RECORDS BELONG TO THE CORPORATION*:  "All books, records, files, forms, reports, accounts and documents relating in any manner to Employers [sic] business or customers, whether prepared by Employee or otherwise coming into Employee's possession, shall be the exclusive property of Employer and shall be returned immediately to Employer upon termination of employment or upon Employer's request at any time."

**{¶ 13}** It is undisputed that after Hall signed this agreement with Key Realty in 2012, his responsibilities and business with Key Realty grew exponentially over the years that followed. Degnan testified that from the end of 2012 until Hall left Key Realty, Hall had four main responsibilities: (1) he recruited real estate agents for Key Realty and hired them into the company; (2) he educated and trained Key Realty agents; (3) he "respond[ed] to day-to-day questions, problems, [and] management intervention situations"; and (4) he was responsible for holding people accountable for inappropriate behavior and "dehiring" them, if necessary.

**{¶ 14}** By the time he left the company in 2019, Hall had multiple Key Realty managers and brokers reporting directly to him, and those managers and brokers oversaw approximately 380 real estate agents. At that time, Key Realty had approximately 1100 agents in total. Hall received a percentage of the revenue that was generated by his group, and he was responsible for paying many of the expenses that were related to his group's business (including paying the managers and brokers who reported to him).

## B. The Formation of Red 1, LLC

**{¶ 15}** Although the parties dispute whether Hall and Degnan had any discussions regarding Hall's potential ownership in Key Realty in 2012—i.e., before the noncompete agreement was executed, and before he assumed management responsibilities for Key Realty—it is undisputed that they had ownership-related discussions after Hall became a manager.

9.

{¶ 16} Hall testified that in "2014-ish," Degnan suggested that they start working on a franchising agreement for him. Degnan testified that these franchise discussions began in 2015. According to Hall, the discussions dragged on for several years, and Degnan changed the form of the would-be ownership arrangement "multiple times." In 2016, Degnan decided against offering Hall a franchise agreement—which, he said, was because of the costs involved with expanding a franchise—and began working on the concept of a "master services agreement" whereby Hall would set up a new LLC, and that new LLC would enter into a management agreement with Key Realty. Degnan testified that he offered this "master services agreement" to Hall in 2018—which, to Degnan, represented "an opportunity to acquire business that I thought was worth millions of dollars"—but Hall declined.

{¶ 17} At that time, Degnan was unaware that Hall had formed a new company—Red 1, LLC—two years before Degnan offered the master services agreement. Hall testified that he formed that new LLC in 2016 because he was "unhappy and angry" when Degnan changed his mind about offering a franchising agreement. In his own words, Hall explained that he formed Red 1 because:

> I was promised ownership for years, and that ownership had then turned into an offer of a franchise agreement, and then that franchise agreement, after years of working on it and getting the circular sent and the franchise agreement sent, the company decided to move in a different direction and not offer a franchise.

{¶ 18} Hall testified, however, that he was "uncertain if [he] wanted to form a brokerage" when he formed Red 1 in 2016, and just "loved the name Red 1 and [he] wanted to reserve that name." Hall also formed a Red 1 entity in Florida to reserve the name there as well.

### C. Pre-Launch Activities in 2018 and Early 2019 Relating to Red 1

{¶ 19} It is undisputed that the two other individual appellees—Heather Hall and Kenton Fairchild—began activities in 2018 to launch Red 1 as a competing real estate brokerage. Hall denies that he was involved in these activities.

{¶ 20} Heather is Hall's wife. She provided day-to-day administrative support for Hall's Key Realty business—for no compensation—starting in 2015 or 2016. Heather is not, and never has been, a licensed real estate broker or real estate agent.

{¶ 21} On or about October 15, 2018, Hall transferred ownership of Red 1 to Heather. Hall testified that he transferred ownership of Red 1 to his wife because "[s]he asked me to." Hall maintained that the transfer of ownership from him to his wife did not have anything to do with the noncompete agreement that he executed in December 2012 with Key Realty. He testified, "I transferred that because my wife said transfer it to me. * * * [W]hen your wife tells you to do something, then sometimes you just do it." When asked whether Heather was aware of his 2012 contract with Key Realty, he answered "[y]ou'd have to ask Ms. Hall."

{¶ 22} Heather testified that she decided to form Red 1 after she "tagged along" with Hall to the Key Realty regional manager meeting in October 2018. She stated that

Degnan promised all of the regional managers at that meeting that "he was going to make them owners of Key Realty. He was going to make them millionaires." When he said that, Heather thought to herself "oh my God, he lied. He's not going to do anything. He's breaking every single promise that he promised my husband." She said that made her "think I should start my own brokerage firm." Heather stated she asked Hall if he wanted to start the business with her, and "[h]e said he was unsure if there was a noncompete or whatever." When asked whether Hall transferred ownership of Red 1 to her to avoid the noncompete agreement, she responded, "I asked him to transfer it. But no, I mean, the noncompete that I saw I did not believe was valid. I just wanted to take precautions and keep my family safe." Heather testified that she did not think the agreement was valid because it refers to Hall as an "employee" and because the signature line for Key Realty was blank.

{¶ 23} Kenton Fairchild was an associate broker with Key Realty, where he worked "hand in hand" with Hall. Unlike Hall, Fairchild did not have a noncompete agreement with Key Realty. Degnan testified that in December 2018, he told Hall to "get a noncompete and an intellectual property agreement from Ken Fairchild" but he did not. Hall testified that he actually followed Degnan's instructions: he sent the noncompete agreement to Fairchild on December 14, 2018, and told him to consult with an attorney. Hall denied that he ever told Fairchild that he should not execute the agreement.

{¶ 24} Just a few weeks before that December 14 discussion—on November 28, 2018—Heather and Fairchild met for the first time to discuss the launch of Red 1 as a

12.

competing brokerage. Hall was not present for that meeting. At that time, Heather told Fairchild that she was "starting" Red 1, she asked him if he would be interested in being the broker of record for her brokerage, and she offered him an ownership interest in the new company. According to Fairchild, at this initial meeting, Heather told him that "Mike has signed some form of noncompete but neither of them thought it was valid." At his deposition, Fairchild would not say whether the agreement prevented Hall from having an ownership interest in Red 1, and he testified that he "didn't know" why Hall was not an owner. Ultimately, Heather and Fairchild agreed that Heather would own 67 percent of Red 1 and Fairchild would own 33 percent.

{¶ 25} For his part, Hall testified that he merely formed Red 1 as an LLC in 2016—with no specific plans to operate it as a real estate brokerage—and he had "no involvement" in starting or running the brokerage firm. He claimed that "[o]nce it came time to start it, Ken and Heather started running it." There is, however, evidence in the record to the contrary. For example,

- Beth Bick, a Key Realty agent in Florida who reported to Hall, testified that in May or June of 2018, Hall asked her if she "wanted to change the name of the company [in Florida] to Red 1 Realty." She told him no, and there were no further discussions.

- On October 25, 2018—i.e., 10 days after Hall transferred ownership of Red 1 to Heather—Hall emailed Insperity Insurance Services LLC stating "We are looking to add insurance for several dozen to several hundred

independent contractors. We are starting a new real estate brokerage firm and would like to differentiate ourselves by offering some type of insurance package."

- In November 2018, a bank account was opened for Red 1 with Heather and Hall as signatories.

- On December 20, 2018, Heather met with Fairchild (their second meeting regarding Red 1), and she provided him with "onboarding documents," including preliminary financial projections. Heather testified that "[she] had created" the documents, but later testified that Hall assisted her in creating the financial projections, stating that "I asked my husband to help me put some numbers on a spreadsheet. Just mainly it was if this scenario, here's some possible expenses that we may incur." Notably, Heather also testified elsewhere that "the bulk of my expertise was primarily supporting the branches with, you know, training, policies and procedures, not doing accounting." And Fairchild testified that he did not review the projected financials for Red 1 to determine if they were reasonable because, he said, "[Heather] knew better than I did"—even though, unlike him, Heather had no real estate experience.

- On January 2, 2019, in another email to Insperity Insurance Services regarding insurance benefits for agents, Hall states, "I am leaving Key

Realty on January 10th. I am hoping 100 agents follow me in the first 3 months and another 100 within the first 6 months."

- In January 2019—shortly before his departure from Key Realty—Hall sent out a survey through the Key Realty Columbus Facebook group (over which the parties dispute ownership) asking Key Realty agents what "additional features and benefits" they would like to see in their brokerage. Key Realty agents provided various responses, including free company-provided leads and free centralized showing services. Shortly after the launch of Red 1, those same benefits would be offered as incentives to Key Realty agents as reasons to switch to Red 1.

- On January 9, 2019, Hall discussed Red 1 with two Key Realty agents, Angela Perez and Daniel Perez, and provided draft marketing materials. Hall testified that he discussed Red 1 with these agents because Degnan had instructed him to terminate Key Realty's relationship with them, so he simply "let them know that Key Realty was sending their license back and there would be another option available to them"—i.e., Red 1.

- Hall testified that he left Key Realty on January 10, 2019, because "Heather said she was starting Red 1 Realty that day." According to Heather, she picked January 10 to start Red 1 because, she said, "I wanted to wait for my husband to get paid out for his December numbers."

{¶ 26} According to Fairchild, he discussed Red 1 with two Key Realty individuals before he left the company. In late December 2018, and early January 2019, he had discussions with Mark Hutchinson, a Key Realty agent and his best friend, about Red 1. At that time, Hutchinson indicated that he would follow Fairchild to Red 1. In addition, on January 8, 2019, he told Carol Sommer, a trainer for Key Realty, that he was going to start a new company that he would like her to join.

### D. The Launch of Red 1

{¶ 27} On January 10, 2019, Red 1 officially launched, and Hall and Fairchild separately resigned from Key Realty. On that date, Hall and Fairchild drove together to the Division of Real Estate, and hand-delivered their applications to transfer their licenses to Red 1. Fairchild became the broker of record for Red 1.

{¶ 28} When he left Key Realty on January 10, Hall "unshared" the Key Realty Columbus Facebook group (an online platform used by Key Realty agents for business-related communication) from Key Realty management—which blocked Key Realty's access to that platform as a means to communicate with its agents. Heather then changed the banner in the Facebook group from Key Realty to Red 1. On that same date, Hall also blocked, or "unshared," various Google drive accounts from Key Realty management, blocking access to any documents that he created while performing work for Key Realty, including "[p]resentations, spreadsheets, Google Drive docs, Exel [sic] sheets, lots of different types of documents." He also blocked Key Realty management from access to the general email for his Key Realty office,

16.

keyrealtycolumbus@gmail.com, and similar gmail accounts for Key Realty Cincinnati, Dayton, Cleveland, Akron, and Sarasota. Hall maintains that all of these actions are justified because he created these online platforms, documents, accounts, and information for his own independent company—Key Realty Columbus 1, LLC—through which he performed his work for Key Realty as an independent contractor, not an employee.

{¶ 29} At 2:32 pm on January 10, 2019, Hall emailed Degnan and Saylor stating:

I wish to rescind any noncompete that I may have signed in the past. If I did sign a non-compete, I never received a signed copy from you. Due to contract law, dispatch and delivery did not occur regarding a bilateral contract.

In addition, I would like to offer many items of consideration in an effort to reach a written mutual release of agreement. Please see the attached termination agreement and release for consideration.

{¶ 30} Attached to his email was a draft "Termination of Agreement and Release," through which Hall proposed that Key Realty terminate the noncompete and fully release all claims that it may have against Hall arising out of the noncompete agreement. As consideration, Hall offered to (1) transfer ownership of Key Realty One Florida to Degnan; (2) transfer ownership of JoinKeyRealty.com to Degnan; (3) sign an agreement stating that neither he nor any family members would operate a brokerage firm in Toledo; (4) turn over ownership of the various gmail accounts, (5) turn over ownership of

17.

Facebook groups, (6) turn over leases, and (7) "work with Key Realty through transition."

{¶ 31} At 8:55 p.m. on January 10, 2019, Fairchild posted in the former Key Realty Columbus Facebook group—which had been unshared with Key Realty management and renamed the "Red 1 Realty" group—in which he stated the following:

> * * * Effective immediately, Heather Hall and I have started a new brokerage, Red 1 Realty, and Mike has also joined us. We will offer the same commission plan you are accustomed to as well as a new option. In addition to the tools you already have, we will also provide Company Leads and CSS at no cost to our agents, Commercial Training, online options for weekly training, additional assistance with KV Core and more. * * * [W]e will be having a Grand Opening at the office on Saturday from 6-9p with food & drinks if you would like to attend. * * *

{¶ 32} On January 12, 2019, appellees hosted the Red 1 grand opening event at the former Key Realty Columbus office. Appellees invited only Key Realty agents to this event. At the event, Hall presented to the Key Realty agents using a power point presentation that he and Fairchild created. The power point states that appellees left Key Realty due to, among other things, "[b]roken promises to management and agents." The document also highlights differences between Red 1 and Key Realty, including company-provided leads, easier Dotloop approval/shorter checklist, free CSS, commercial training and assistance, and "more to follow – health benefits, credit cards." Key Realty

18.

maintains that many of these items were identified in the January 2019 survey that Hall sent to Key Realty agents in the days before his departure. The Red 1 power point also includes an "easy transition offer," which would end on February 15, in which Red 1 offered to pay transfer fees and take transfer applications to the Division of Real Estate for Key Realty agents, replace their business cards, replace two signs, and honor their anniversary dates.

{¶ 33} At Red 1, Hall provided commercial real estate training for Red 1 agents, and Fairchild provided residential real estate training. Hall testified, however, that he has not received any payments from Red 1 whatsoever, and there is no "formalized plan" for him to be paid for any work that he does for the company as an independent contractor.

{¶ 34} According to Degnan, Key Realty lost approximately 200 agents in the Columbus area and suffered other damages due to appellees' conduct.

### E. The Current Litigation

{¶ 35} On January 15, 2019, Key Realty filed this case against Hall, Heather, Fairchild, and Red 1, along with a motion for temporary restraining order and preliminary injunction. The next day, the trial court held a hearing on Key Realty's motion for temporary restraining order. At the conclusion of the hearing, the trial court ordered Hall, among other things, to return various documents and online platforms—including the Key Realty Columbus Facebook page—to Key Realty.

{¶ 36} The very same day, between 4:30 p.m. and 5:21 p.m., Heather deleted many posts from the Facebook page. When asked in her deposition why she removed

these posts on January 16, 2019, she responded "I really can't recall," "I don't know," and "I can't remember."

## F. The Trial Court Judgment

{¶ 37} Appellees filed motions for summary judgment, seeking dismissal of all of Key Realty's claims. The trial court denied summary judgment to Hall on Count 1 as it related to Key Realty's allegations of breach of the non-competition and non-solicitation provisions of the agreement, but it granted summary judgment to Hall for breach of the confidentiality provisions. It held that despite Key Realty's allegations to the contrary, there was insufficient evidence to show that Hall disclosed to Heather and Fairchild information concerning Key Realty's business. It explained that while there may be evidence that Heather and Fairchild used Key Realty's data in formulating their business plan, there is nothing in the record to indicate that they got this information from Hall.

{¶ 38} As to Count 2, trade secret misappropriation, the trial court was skeptical that the information at issue constituted trade secrets. It determined that even if the information did constitute protected trade secrets, Key Realty failed to demonstrate how appellees used any of the protected information.

{¶ 39} As to Count 3, unfair competition, the trial court determined that the competition appellees engaged in with Key Realty was not unfair because they were also simultaneously competing with all other real estate brokerage services companies. It found that there was no evidence that anyone believed that Red 1 was really just Key Realty, that Red 1 held itself out to the public as Key Realty, or that any agent or broker

20.

of Red 1 claimed to be a Key Realty agent or broker. And it found that Red 1's own name and logo appeared on all of its publicly available information, and any genuine issue of fact as to who owned a particular "Key Facebook group" did not rise to the level of unfair competition because there was no evidence that appellees' actions were "designed to harm the business of another."

{¶ 40} As to Count 4, tortious interference with business relations, the trial court determined that Key Realty's claim of tortious interference with its business relations could not survive summary judgment because the nature of the conduct alleged "was minor, and involved nothing more than Facebook group activity of no importance to Key Realty business operations." It found that appellees had "consistently and repeatedly assert[ed] * * * their belief that the Key Facebook group belonged (and continues to belong) to Hall, not to Key Realty. And it concluded that appellees' actions were motivated by a desire to promote the Red 1 business, rather than to harm Key Realty's business, and there was nothing tortious about Heather or Fairchild's efforts to recruit Key Realty agents.

{¶ 41} As to Count 5, tortious interference with contract, the court found that Hall had made his own decision to leave Key Realty—Heather and Fairchild did not "procure" his breach of the agreement. The court also found that appellees did not interfere with Key Realty's contracts with its agents because no contracts existed.

{¶ 42} As to Count 6, breach of fiduciary duty, the trial court determined that even accepting as true all of Key Realty's assertions, Key Realty failed to demonstrate how

Hall had agreed "'to act primarily for the benefit of [Key] in matters connected with its [business].'" It further held that even if a duty did exist, Key Realty failed to articulate the specific duty that was owed to Key Realty or how Hall may have breached it.

{¶ 43} As to Count 7, conversion, the trial court determined that there was no evidence in the record that Key Realty demanded the return of the property in question, let alone that appellees refused to return it.

{¶ 44} As to Counts 8 and 10, unauthorized use of computer, cable or telecommunication property and civil theft, the trial court concluded that appellees had maintained "an unwavering position" that any disputed electronic resources used or accessed by them, if any, were the property of Key Realty Columbus 1, LLC, which was undisputedly owned by Hall. Moreover, the court held, Key Realty failed to provide evidence that appellees "'knowingly' used and operated the electronic resources without proper consent."

{¶ 45} As to Count 9, criminal mischief, the trial court found that Key Realty's claims of impaired functioning of its computer systems and electronic resources failed because the evidence showed that appellees acted with the intent to benefit Red 1 and not to impair the functioning of Key Realty's computer systems.

{¶ 46} As to Count 11, extortion, the trial court concluded that Key Realty's evidence "reveals no threat by Michael Hall to commit any theft offense, whatsoever. * * * Thus, there is nothing in the record to suggest that Michael Hall either 1) threatened to knowingly obtain or exert control over Key property or services; or 2) engaged in the

22.

unauthorized use of computer or telecommunication property * * *." The court found that the email from Hall to Degnan showed "nothing more than an intent on the part of Michael Hall to negotiate with his former employer [to rescind the Agreement], using items he 'owned' as leverage to assist with his negotiations."

{¶ 47} As to Count 12, spoliation, the trial court determined that "[e]ven accepting, arguendo, that defendants may have willfully destroyed evidence in an attempt to disrupt plaintiff's case, there is simply no evidence or allegation to suggest that any disruption to plaintiff's case occurred." It further found that Key Realty failed to provide evidence of damages proximately caused by appellees' conduct.

{¶ 48} And as to Count 13, civil conspiracy, the trial court concluded that because every count—except Count 1—had been dismissed, Key Realty could not prove that there had been a "malicious combination of two or more persons" to injure it.

### G. *Key Realty I*

{¶ 49} Key Realty appealed the trial court's judgment. The majority affirmed the trial court's dismissal of Key Realty's claims, including the claim for breach of the confidentiality provision of the agreement. But the majority went further. It reversed the trial court's judgment denying summary judgment to Hall on Key Realty's claim for breach of the non-competition and non-solicitation provisions of the agreement.

{¶ 50} The majority reasoned that a contract is not binding without consideration, and here, the agreement contained a blank line where the consideration was supposed to be recited. It acknowledged that an at-will employee's continued employment may serve

23.

as consideration for an employment agreement, but it concluded that because Hall was an independent contractor—not an employee—his continued employment could not serve as the consideration necessary to form a contract here. The majority held that "[b]ecause Mr. Hall was never appellant's employee * * * appellant did not provide Mr. Hall with proper consideration when he signed the Agreement." It affirmed the trial court's decision granting summary judgment to Hall as to the confidentiality provisions of the agreement and reversed its denial of summary judgment on the additional contract claims.

### III. Law and Analysis

{¶ 51} Key Realty now asks that we reconsider and reverse the majority decision, and adopt the reasoning of the dissenting opinion. The dissent would have reversed the trial court judgment, except as to (1) that part of Key Realty's claim for tortious interference with contract that relates to interference with alleged contracts between Key Realty and its agents, (2) Key Realty's spoliation claim against Hall and Fairchild (but not against Heather), (3) Key Realty's claim for criminal mischief, and (4) Key Realty's claim for misappropriation of trade secrets.

{¶ 52} Under App.R. 26(A)(1), an "[a]pplication for reconsideration of any cause or motion submitted on appeal shall be made in writing no later than ten days after the clerk has both mailed to the parties the judgment or order in question and made a note on the docket of the mailing as required by App. R. 30(A)." The test generally applied in considering a motion for reconsideration in the court of appeals is whether the motion

24.

identifies an obvious error in the court's decision or raises an issue that was either not considered at all or not fully considered by the court when it should have been. *Matthews v. Matthews*, 5 Ohio App.3d 140, 143, 450 N.E.2d 278 (10th Dist.1981). "A motion for reconsideration is not designed for use in instances when a party merely disagrees with the conclusions reached and the logic used by the appellate court." (Citations omitted.) *Deutsche Bank Natl. Trust Co. v. Greene,* 6th Dist. Erie No. E-10-006, 2011-Ohio-2959, ¶ 2. It is also not to be used as an opportunity to raise new arguments that were not made in earlier proceedings. *Waller v. Waller,* 7th Dist. Jefferson No. 04-JE-27, 2005-Ohio-5632, ¶ 3.

{¶ 53} Key Realty argues that the majority decision made obvious errors of fact and law that contravene Ohio Supreme Court and other Ohio case law. Most importantly, it argues that the decision conflicts with the Ohio Supreme Court's decisions in *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, and *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 714 N.E.2d 898 (1999), and the decisions of the Tenth and First Districts, respectively, in *Americare Healthcare Servs. LLC v. Akabuaku*, 10th Dist. Franklin No. 10AP-777, 2010-Ohio-5631, and *Financial Dimensions, Inc. v. Zifer*, 1st Dist. Hamilton No. C-980960, 1999 WL 1127292, *4 (Dec. 10, 1999). Key Realty also argues that the majority failed to consider the substantive merits of many assignments of error because it based its decision upon the erroneous conclusion that Hall's noncompete agreement is unenforceable as a matter of law. And, regarding the merits of those assignments of error that the majority

25.

did consider, Key Realty argues that the majority decision contains obvious errors of facts and law. Key Realty does not, however, ask this court to reconsider those issues upon which the majority and dissenting judge agreed.

{¶ 54} As explained below, we agree that *Key Realty I* conflicts with several Ohio cases—including governing precedent from the Supreme Court of Ohio—and contains other obvious errors of fact and law. We, therefore, grant Key Realty's motion and vacate *Key Realty I*, except to the extent that it affirmed the dismissal of (1) that part of Key Realty's claim for tortious interference with contract that relates to interference with alleged contracts between Key Realty and its agents, (2) Key Realty's spoliation claim against Hall and Fairchild (but not against Heather), (3) Key Realty's claim for criminal mischief, and (4) Key Realty's claim for misappropriation of trade secrets.

{¶ 55} Having granted Key Realty's motion for reconsideration, we shall now address the assignments of error in turn.

### A. First Assignment of Error: Breach of Contract (against Hall)

{¶ 56} In its amended complaint, Key Realty alleges that Hall breached the noncompete agreement by (1) directly competing with Key Realty, (2) soliciting Key Realty agents and customers, (3) using and disclosing Key Realty's confidential information, and (4) failing to return all books, records, and other materials that relate to Key Realty's business or customers upon his termination. The trial court concluded that there are genuine issues of material fact regarding whether Hall violated the agreement

by competing with Key Realty, soliciting Key Realty agents and customers, and failing to return all Key Realty-related materials upon his termination—thereby precluding summary judgment on those parts of Key Realty's contract claim. The trial court granted summary judgment to Hall on the remaining aspect of Key Realty's breach-of-contract claim—i.e., Hall's alleged use and disclosure of confidential information. On appeal, Key Realty argues that part of the trial court's order was error.

{¶ 57} The majority in *Key Realty I* did not reach the merits of Key Realty's assignment of error. Instead, it declared the entire noncompete agreement void for lack of consideration. The majority concluded that Key Realty failed to "provide Mr. Hall with proper consideration" when he signed the noncompete agreement because he "was never appellant's employee and was never appellant's co-owner" and, therefore, "[a]t most it appears appellant offered a gratuitous promise as consideration." This conclusion was obvious error for the following reasons.

{¶ 58} First, it is irrelevant that Hall was "never appellant's employee." As the Supreme Court of Ohio has recognized, noncompete agreements may be executed outside the employer-employee relationship and noncompetes that are executed by independent contractors can be enforceable. *Hamilton Ins. Serv.,* 86 Ohio St.3d 270, 714 N.E.2d 898 (enforcing a noncompete clause in a corporate agency agreement between Nationwide and an independent contractor). Indeed, several Ohio appellate courts have expressly concluded that the "the enforceability of [a noncompete] agreement does not depend on

27.

[the worker's] status as an employee or independent contractor." *Americare Healthcare Servs.* at ¶ 21; *Financial Dimensions, Inc.*, 1st Dist. Hamilton No. C-980960, 1999 WL 1127292, at *4 (finding that the distinction between at-will employee and independent contractor is "not relevant" when considering the enforceability of a noncompete agreement). We similarly conclude, under the authority of these cases, that noncompete agreements executed by independent contractors can be binding and enforceable. Moreover, although the parties in this case used the terms "Employee" and "Employer" to refer to themselves in the noncompete agreement—i.e., the contract provides that it is by and between "Mike Hall * * * (hereinafter 'Employee') and Key Realty, Ltd. (hereinafter referred to as 'Employer')"—those are merely defined terms for purposes of the contract and, therefore, have no legal significance.

{¶ 59} Second, the record contains no evidence that Hall's independent-contractor relationship with Key Realty had a specific term of duration, and "employment with no specific term of duration gives rise to an employment-at-will relationship, regardless of whether the underlying relationship is one of employer-employee or employer-independent contractor." *Americare Healthcare Servs.* at ¶ 24. Hall's relationship with Key Realty was therefore an employment-at-will relationship, even though the underlying relationship was employer-independent contractor.

{¶ 60} Third, it is very well established that "[c]onsideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment

28.

relationship that could legally be terminated without cause." *Lake Land Emp. Group of Akron, LLC*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, at ¶ 20. In *Key Realty I*, the majority overlooked this binding precedent when it concluded that Hall's noncompete agreement lacked consideration. That is, the record contains no evidence of any contract, written or oral, that established a specific duration for Hall's relationship with Key Realty. Accordingly, "the parties' relationship was at-will" and Hall's "independent contractor status does not diminish the applicability of the *Lake Land* holding." *Americare* at ¶ 24 (finding that noncompete between employer and independent contractor was supported by consideration because the contractor "continued to perform services" for the employer after the execution of the agreement); *see also Financial Dimensions, Inc.* at *4 (finding that the employer's "continuation of the parties' relationship was sufficient consideration to support Zifer's agreement to the provisions in the covenant not to compete" and Zifer's status as an independent contractor, rather than an at-will employee, was "not relevant to the issue under consideration").

{¶ 61} Indeed, it is undisputed that Hall and Key Realty continued their at-will relationship for six years after Hall executed the noncompete agreement in 2012. Because there is no evidence in the record to suggest that either party was required to continue their relationship for any period of time, the continuation of their employer-independent contractor relationship went beyond what either party was otherwise

29.

obligated to do, and therefore constituted sufficient consideration for the noncompete agreement that Hall signed. *Lake Land* at ¶ 20.

{¶ 62} In *Key Realty I*, the majority concluded differently, relying upon Hall's testimony that he signed the noncompete agreement "on the future promise of ownership," which never occurred. But, even if this "future promise" is assumed to be true, it is not relevant to the enforceability of the agreement. As discussed, under *Lake Land*, the contract is nonetheless supported by consideration given the continuation of their at-will relationship.

{¶ 63} Moreover, the written contract does not include a "future promise of ownership." Instead, the contract expressly provides that the parties' agreement is "in consideration of *the mutual promises contained herein*, and for other good and valuable consideration, including _____, the receipt of which and the sufficiency of which are hereby acknowledged." (Emphasis added.) The *Key Realty I* majority committed an obvious mistake of fact when it concluded that the agreement has "a blank line where the description of the consideration should go," while ignoring the preceding language which stated that the agreement is "in consideration of the mutual promises contained herein." Although not specifically labeled as a "promise" from Key Realty in the agreement, the contract specifically states that Hall will "gain valuable information and insights on the lines of business in which Employer is engaged; access to Employer's confidential and proprietary information; and exposure to its existing and potential business opportunities." In exchange, Hall promised that he would not compete against Key Realty, solicit its

30.

customers or employees, or use its business information. Accordingly, the written contract contains a bargained-for benefit and detriment, fully satisfying the general definition of consideration in Ohio. *Kostelnick v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976) (stating that consideration is "the bargained for legal benefit and/or detriment").

{¶ 64} Finally, even though Hall denied that he signed the noncompete in 2012 because he was being promoted to manager (and claimed that the agreement was signed "on the future promise of ownership" instead), the majority overlooked plenty of evidence in the record that creates a genuine dispute of fact on that issue (to the extent that it is even relevant). That is, the record shows that Hall's execution of the noncompete agreement in 2012 coincided with the termination of his employment with Old Republic Home Warranty and promotion into a management position with Key Realty. As Degnan testified, Hall was "untested as a manager" in 2012. For that reason, Degnan maintains that it would have been "ridiculous" to have offered an ownership interest to Hall at that time. The ultimate factfinder must determine the respective credibility of Degnan and Hall on this issue.

{¶ 65} For these reasons, the noncompete agreement is supported by consideration and is fully enforceable.

{¶ 66} We now consider the substantive merits of Key Realty's first assignment of error, which were not considered by the majority in *Key Realty I*. Key Realty argues that

there is a genuine dispute of material fact regarding whether Hall breached his obligations under paragraph 6 of the agreement, which provides that Hall cannot directly or indirectly disclose "any information of any kind * * * concerning any matters affecting or relating to the business of Employer" including, without limitation, any information regarding "its plans, processes, work in process or any other data of any kind * * * without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."

{¶ 67} The trial court concluded that although there is evidence that Red 1 had information regarding Key Realty—most notably, the results of the survey that Hall sent to Key Realty agents in January 2019, which were later offered by Red 1 as incentives to Key Realty agents to get them to switch companies—"there is nothing in the record to indicate that they got this information from Michael Hall."  To the contrary, there is evidence in the record that could lead a reasonable factfinder to conclude that Hall sent the survey to Key Realty agents in January 2019 *precisely because* he intended to gather information for Red 1 to use to solicit Key Realty agents.  Indeed, the timing and content of the survey itself is circumstantial evidence of this.  That is, just a few days before he departed Key Realty for Red 1, Hall sent a survey to Key Realty agents to determine "[w]hat additional features and benefits" those agents would "like from [their] brokerage."  And, two days after he left Key Realty, the information gathered through those survey responses appears in a power point presentation—jointly prepared by Hall and Fairchild—that was used at the Red 1 grand opening to convince Key Realty agents

32.

to switch to Red 1. This evidence is sufficient to create a genuine dispute of material fact regarding Hall's breach of paragraph 6 of the noncompete agreement.

{¶ 68} We, therefore, grant Key Realty's motion for reconsideration on this issue, and reverse the trial court's decision to the extent that it grants summary judgment to Hall on Key Realty's claim that Hall used and/or disclosed information related to its business in contravention of the noncompete agreement. In addition, we affirm that portion of the trial court's judgment that found genuine issues of material fact relating to the remainder of Key Realty's breach-of-contract claim against Hall. The record—as outlined in the fact section above—demonstrates the existence of questions of fact relating to this entire claim.

{¶ 69} Accordingly, we find Key Realty's first assignment of error well-taken.

### B. Second Assignment of Error:
### Misappropriation of Trade Secrets (against all appellees)

{¶ 70} Key Realty does not ask us to reconsider the determination that we made in *Key Realty I* to affirm the trial court's dismissal of its claim for misappropriation of trade secrets.

### C. Third Assignment of Error:
### Unfair Competition (against all appellees)

{¶ 71} In its motion for reconsideration, Key Realty argues that the majority made an obvious error of fact by overlooking material evidence in the record that creates a genuine dispute regarding whether the appellees engaged in unfair competition. We agree.

33.

**{¶ 72}** "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. * * * The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85, 472 N.E.2d 715 (1984); *see also Microsoft Corp. v. Action Software*, 136 F.Supp.2d 735, 740 (N.D.Ohio 2001), quoting Ohio Jurisprudence 3d, Trade Regulations, Section 66 (1989) (recognizing that unfair competition "has come to develop a broader connotation in recent years"). To the extent that the "circulation of false rumors" may form the basis of the claim, summary judgment is appropriate where "no competent evidence has been presented which creates a question of fact as to whether [defendants] circulated false rumors, or published statements designed to harm [plaintiff's] business." *Molten Metal Equip. v. Metaullics Systems Co.*, 8th Dist. Cuyahoga No. 76407, 2000 WL 739470, * 5 (June 8, 2000).

**{¶ 73}** Here, at a minimum, Key Realty presented competent evidence that creates a question of fact as to whether appellees circulated false rumors and published statements that were designed to harm Key Realty's business. That is, the power point presentation that was used at the Red 1 grand opening event to solicit Key Realty agents to join Red 1, states that Key Realty had made "broken promises" to agents. Heather was asked at her deposition to identify any of these "broken promises," but she could not:

34.

Q: So can you identify any specific broken promise that was made to a specific agent?

A: I can't per se.

{¶ 74} Moreover, the majority failed to recognize that all of the evidence—as summarized above—should be weighed by the ultimate factfinder to assess witness credibility and thereby determine appellees' true intentions. The trial court concluded that appellees were not engaged in unfair competition, as a matter of law, because "they were also simultaneously competing with all other real estate brokerage services companies." But the factfinder should have the opportunity to weigh that fact against the other evidence in the record—for example, Hall's statement that he hoped that "100 agents" from Key Realty would follow him to Red 1 "within 3 months" and "another 100 within the first 6 months"—to determine whether appellees engaged in unfair competition by soliciting Key Realty agents through the use of any false rumors or published statements that were intended to harm Key Realty.

{¶ 75} Accordingly, we grant Key Realty's motion for reconsideration on this issue, reverse summary judgment on Key Realty's claim against appellees for unfair competition, and remand that claim to the trial court for further proceedings. We find Key Realty's third assignment of error well-taken.

**D. Fourth Assignment of Error:**
**Tortious Interference with Contract (against Red 1, Heather, and**
**Fairchild) and Tortious Interference with Business Relations**
**(against all appellees)**

{¶ 76} Key Realty asserted a claim against Red 1, Heather, and Fairchild for tortious interference with contract, alleging that those appellees permitted, caused, encouraged and/or induced Hall's breach of his noncompete agreement.[1] Key Realty also asserted a claim against all appellees, arguing that they tortiously interfered with Key Realty's business relationship with its agents. We will address these claims separately.

### 1. Tortious Interference with Contract

{¶ 77} The trial court granted summary judgment to appellees on its tortious interference with contract claim because "Michael Hall made his own decision to stop working for plaintiff as an independent contractor." In *Key Realty I*, the majority affirmed the trial court's judgment on this claim. The majority concluded that Key Realty has no tortious interference with contract claim, as a matter of law, because the underlying noncompete agreement between Hall and Key Realty was unenforceable. Key Realty argues that the noncompete agreement is enforceable (as discussed above, we agree), and the majority therefore erred when it failed to consider the substantive merits of its arguments relating to this claim. We agree.

---

[1] Key Realty also claimed that appellees tortiously interfered with alleged contracts between it and its agents. Key Realty does not ask us to reconsider that portion of *Key Realty I* that affirmed summary judgment as to that portion of its tortious-interference-with-contract claim.

36.

{¶ 78} The elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoers' knowledge of the contract, (3) the wrongdoers' intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph one of the syllabus.

{¶ 79} Here, as discussed, the majority erred when it concluded that the noncompete agreement between Hall and Key Realty is unenforceable. The agreement is enforceable and questions of fact remain regarding Key Realty's claim for breach of contract. Regarding the remaining elements of this tortious-interference claim, Heather and Fairchild both testified that they were aware of the agreement, and that they discussed the agreement to some degree at their initial meeting regarding Red 1. Although Heather testified that she did not think the agreement was valid, and Fairchild would not say whether the agreement prevented Hall from having an ownership interest in Red 1 and testified that he "didn't know" why Hall was not an owner of Red 1, their credibility on those issues should be weighed by the ultimate factfinder. A reasonable factfinder could conclude that the circumstances surrounding the inception and structure of Red 1 LLC—i.e., that it was transferred from Hall to Heather in October 2018, and that Fairchild owns only one-third of the company while Heather owns two-thirds of the company despite her lack of real estate experience—demonstrates that these appellees were attempting to end run Hall's obligations to Key Realty under his noncompete from the beginning.

37.

{¶ 80} This evidence could also be interpreted by a reasonable factfinder as tending to show that the appellees intentionally procured Hall's breach. Although the trial court found it to be dispositive that Hall made "his own decision" to leave Key Realty, that fact is immaterial for purposes of this claim. Key Realty does not allege that Hall breached his agreement by leaving Key Realty—it alleges that Hall breached his agreement by competing with Key Realty by, among other things, soliciting its agents to Red 1, sharing its confidential information with Red 1, and training Red 1 agents. There is testimony and evidence in the record that, if believed (or not believed, as the case may be), demonstrates that these appellees worked with Hall to establish Red 1 as a competing brokerage, and that they carefully and deliberately structured Red 1 in a manner that was designed to avoid Hall's noncompete agreement with Key Realty.

{¶ 81} We therefore grant Key Realty's motion to reconsider on this issue, we reverse summary judgment on Key Realty's claim against Red 1, Heather, and Fairchild for tortious interference with contract, and remand that claim to the trial court for further proceedings.

{¶ 82} To be clear, to the extent that Key Realty's claim for tortious interference with contract includes an allegation that all appellees interfered with "Key Realty's contractual relationships with its agents and other contractual partners," summary judgment is warranted on that part of the claim. Indeed, Key Realty has not asked us to reconsider that portion of our *Key Realty I* decision.

38.

## 2. Tortious Interference with Business Relationships

{¶ 83} In *Key Realty I*, the majority held that where a defendant's breach of contract "necessarily interferes with the injured party's business relations with third parties," the injured party is generally limited to an action for breach of contract. *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 46, 540 N.E.2d 1358 (1989). In other words, the majority concluded that Key Realty is limited to its breach-of-contract claim against Hall and, as a matter of law, cannot maintain a separate action for any resulting interference with its business relationships. Key Realty argues—and we agree—that the majority committed an obvious error of law by failing to recognize an applicable exception to that rule. That is, "[a]n exception exists, and a tort action may lie, only where the breaching party indicates, by his breach, *a motive to interfere with the adverse party's business relations* rather than an interference with business as a mere consequence of the breach." *Id.*; *see also Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.*, 116 Ohio App.3d 692, 700, 689 N.E. 2d 56 (1st Dist.1996) (recognizing that a party can maintain both a breach of contract claim and a tortious interference with business relations claim if (1) there is a motive to interfere with the injured party's business relations and (2) the interference is not "merely incidental to the breach.").

{¶ 84} Here, there is sufficient evidence in the record to create a genuine dispute as to whether Hall had a "motive to interfere with the adverse party's business relations." For example, Hall stated, just a few days before he left Key Realty, that "I am hoping 100

39.

agents follow me in the first 3 months and another 100 within the first 6 months." That statement could be viewed by a reasonable factfinder as evidence that Hall had a distinct motive to raid Key Realty's agents in the Columbus area for the benefit of Red 1 and, therefore, any interference with Key Realty's agent relationships was not merely incidental to any breach of his noncompete agreement.

{¶ 85} Moreover, considering the general elements of this tort, there is a question of fact regarding whether all appellees tortiously interfered with Key Realty's agent relationships—and we find that the evidence on this issue was not fully considered by the majority decision of *Key Realty I*. This tort requires (1) the existence of a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a termination of that relationship, and (4) resulting damages. *Wauseon Plaza Ltd. Partnership v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, ¶ 57 (6th Dist.). Although the interference must be done with actual malice, "[a]ctual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship." *Chandler & Assocs., Inc. v. Am.'s Healthcare Alliance, Inc.*, 125 Ohio App.3d 572, 583, 709 N.E.2d 190 (8th Dist.1997). Where the alleged wrongdoer and the injured party are competitors, any interference is privileged (and therefore not actionable) if (1) the relation concerns a matter of competition between them, (2) the actor does not use "improper means" to interfere, (3) the actor does not intend to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance

40.

his own competitive interests. *MedCorp., Inc. v. Mercy Health Partners*, 6th Dist. Lucas No. L-08-1227, 2009-Ohio-988, ¶ 43-48.

{¶ 86} Here, the record demonstrates that appellees intentionally interfered with Key Realty's business relationships by soliciting its agents to join Red 1, and that Key Realty suffered damages as a result. The only question is whether appellees used "improper means" to intentionally interfere with these relationships—if so, their conduct was not privileged competition.

{¶ 87} Based on all the evidence in the record, a reasonable factfinder could conclude that appellees used "improper means" to interfere with Key Realty's agent relationships. For example, a factfinder could conclude that, pursuant to the terms of Hall's noncompete agreement, Key Realty owned the Facebook group and the other online platforms that appellees commandeered to directly solicit Key Realty's agents. Indeed, Hall agreed in the noncompete agreement that "*all* books, *records, files,* forms, reports, *accounts* and documents" relating to Key Realty's business—including any such items that were "prepared by" Hall himself—are "the exclusive property" of Key Realty. If these items are found to be Key Realty's "exclusive property," then a factfinder could also conclude that it was improper for appellees to use the Facebook account and other online platforms—to the complete exclusion of Key Realty management—to communicate with and solicit Key Realty agents.

{¶ 88} Accordingly, we grant Key Realty's motion for reconsideration on this issue, reverse summary judgment on Key Realty's claim against appellees for tortious

interference with business relations, and remand that claim to the trial court for further proceedings. We find Key Realty's fourth assignment of error well-taken.

### E. Fifth Assignment of Error:
### Breach of Fiduciary Duty (against Hall)

{¶ 89} In the amended complaint, Key Realty asserted a breach of fiduciary duty claim against Hall. The trial court granted summary judgment to appellees on this claim. In *Key Realty I*, the majority affirmed, finding that any language in Hall's noncompete agreement could not create a fiduciary duty because the noncompete agreement is unenforceable as a matter of law. In its motion for reconsideration, Key Realty argues that the majority erroneously concluded that the noncompete agreement is unenforceable as a matter of law (as discussed above, we agree) and, therefore, the majority committed obvious error when it failed to consider the merits of its fiduciary-duty claim against Hall. We agree.

{¶ 90} A "fiduciary relationship" is one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Hope Academy Broadway Campus v. White Hat Mgt., LLC*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, ¶ 43, quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.3d 107, 115, 321 N.E.2d 603 (1974). "The determination concerning what constitutes a confidential (fiduciary) relationship is a question of fact dependent upon the circumstances of each case." *B-G Leasing Co. v. First Nat'l Bank*, 6th Dist. Huron No. H-89-56,

42.

1991 WL 87113, * 3 (May 4, 1999), quoting *Indermill v. United Savings*, 5 Ohio App.3d 243, 245, 451 N.E.2d 538 (9th Dist.1982). Generally, there is no fiduciary relationship between an employer and an independent contractor "unless both parties understand that that relationship is one of special trust and confidence." *Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 204, 759 N.E.2d 869 (7th Dist.2001). "A fiduciary duty may arise out of a contract or an informal relationship," so long as both parties "understand that a special trust of confidence has been reposed." *M.S. v. Toth*, 2017-Ohio-7791, 97 N.E.3d 1206, ¶ 27 (9th Dist.), quoting *RPM, Inc. v. Oatey Co.*, 9th Dist. Medina Nos. 3282-M, 2005-Ohio-1280, ¶ 19.

{¶ 91} Whether Hall owed any fiduciary duties to Key Realty is a question of fact that cannot be resolved on summary judgment. Although Hall worked for Key Realty as an independent contractor, he signed an enforceable contract acknowledging that Key Realty was placing him "in a position of trust and confidence, requiring a high degree of loyalty, honesty, and integrity," and he agreed that he would not "use or divulge" any of Key Realty's business-related information for his own "personal gain" or "to the detriment of" Key Realty. According to Degnan, the realities of their relationship demonstrated that Hall maintained a position of trust and confidence. Hall, on the other hand, when asked whether he was placed within a position of trust and confidence at Key Realty, responded "[s]ometimes yes and sometimes no."

{¶ 92} Given the evidence in the record, especially the explicit language of the contract that Hall signed, a genuine dispute of material fact exists regarding whether Hall

43.

owed any fiduciary duties to Key Realty that he breached through his conduct related to Red 1.

{¶ 93} Accordingly, we grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim against Hall for breach of fiduciary duty, and we remand that claim for further proceedings. We find Key Realty's fifth assignment of error well-taken.

### F. Sixth Assignment of Error: Conversion (against all appellees)

{¶ 94} In its amended complaint, Key Realty asserted a claim for conversion of its Facebook page, email accounts, websites, calendars, and Google Drive resources. This claim is premised on appellees' conduct in altering administrative privileges, expelling Key Realty owners from Key Realty's central Ohio forums, and blocking owners and directors from those materials and accounts. The trial court granted summary judgment to appellees on this claim, reasoning that Key Realty failed to demand that appellees return the property. In *Key Realty I*, the majority affirmed after concluding that *Hall*— not Key Realty—owns the disputed property through his LLC. In its motion for reconsideration, Key Realty argues that the majority wholly overlooked one of its arguments on appeal—i.e., that the trial court improperly granted summary judgment on a ground not specified by the moving party—and, in addition, overlooked material facts that create a genuine dispute regarding ownership of the property in question. We agree.

44.

{¶ 95} To prevail on a claim for conversion, a plaintiff must prove "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, 62 N.E.3d 928, ¶ 28 (8th Dist.). If the defendant came into possession of the property lawfully, the plaintiff must also prove "(1) that the plaintiff demanded the return of the property after the defendant exercised dominion or control over the property; and (2) that the defendant refused to deliver the property to the plaintiff." *Id.* Because appellees came into possession of the property lawfully, the trial court concluded that Key Realty was required—but failed—to prove these additional elements.

{¶ 96} Although not considered by the majority, Key Realty argued on appeal that this was error because a trial court may not award summary judgment on a ground not specified in the motion for summary judgment. It cites *State ex rel. Sawicki v. Court of Common Pleas of Lucas Cty.*, 121 Ohio St.3d 507, 2009-Ohio-1523, 905 N.E.2d 1192, ¶ 27. There, the Ohio Supreme Court recognized that "'[i]t is reversible error to award summary judgment on grounds not specified in the motion for summary judgment.'" *Id.*, citing *Patterson v. Ahmed,* 176 Ohio App.3d 596, 2008-Ohio-362, 893 N.E.2d 198, ¶ 14 (6th Dist.). The court explained that by relying on an unargued ground for granting summary judgment, the non-movant is denied a meaningful opportunity to respond. *Id. See Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus ("A party seeking summary judgment must specifically delineate the basis upon which summary

judgment is sought in order to allow the opposing party a meaningful opportunity to respond").

{¶ 97} We agree with Key Realty. In their summary-judgment motions, appellees argued that they were entitled to summary judgment on Key Realty's conversion claim because the property at issue belonged to Key Realty Columbus 1, LLC, owned solely by Hall. Appellees did not argue that Key Realty failed to establish that it had demanded return of the property. As such, Key Realty was denied a meaningful opportunity to refute the conclusion reached by the court.

{¶ 98} Additionally, as to the arguments that were raised by appellees, we find that the majority overlooked evidence in the record that creates a genuine issue of material fact. That is, paragraph 7 of the noncompete agreement—which provides that "all books, records, files, forms, reports, accounts and documents relating in any manner to [Key Realty's] business or customers, whether prepared by [Hall] or otherwise coming into [Hall's] possession, shall be the exclusive property of [Key Realty] and shall be returned immediately to [Key Realty] upon termination of employment * * *"—belies Hall's claim of ownership and, at the very least, creates a genuine issue of material fact precluding summary judgment.

{¶ 99} Accordingly, we grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim against appellees for conversion, and we remand that claim for further proceedings. We find Key Realty's sixth assignment of error well-taken.

46.

### G. Seventh Assignment of Error:
### Alleged Criminal Acts

{¶ 100} R.C. 2307.60(A)(1) provides that "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law * * *." *See Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 10 ("R.C. 2307.60(A)(1), by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act."). Proof of an underlying criminal conviction is not required to maintain an action under R.C. 2307.60. *Buddenberg v. Weisdack,* Slip Opinion No. 2020-Ohio-3832.

{¶ 101} In its amended complaint, Key Realty asserts civil claims for the following criminal conduct that it claims appellees committed: (1) unauthorized use of computer, cable, or telecommunication property, a violation of R.C. 2913.04(A) or (B); (2) criminal mischief, a violation of R.C. 2909.07(A)(6)(a); (3) theft; and (4) extortion, a violation of R.C. 2905.11(A)(1). The trial court judgment granted summary judgment in favor of appellees on all of Key Realty's claims premised on violations of criminal statutes. In *Key Realty I*, the majority affirmed. Key Realty asks us to reconsider our ruling with respect all of these claims—except criminal mischief—arguing that the majority's opinion contains obvious errors of fact and law.

#### 1. Unauthorized Use of Computer Property (against all appellees)

{¶ 102} Under R.C. 2913.04 (A), "[n]o person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give

47.

consent." Under R.C. 2913.04(B), "[n]o person, in any manner and by any means * * * shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, * * * or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, * * * or information service or other person authorized to give consent."

{¶ 103} The trial court held that because appellees purportedly believed that Hall's LLC owned the electronic resources at issue, Key Realty is unable to establish the "knowingly" element of the offense, thus precluding its claim. In *Key Realty I*, the majority concluded that Key Realty could not rely upon the noncompete agreement to establish ownership of the disputed property because that agreement was not enforceable—and, therefore, Key Realty could not show that the appellees used or operated "the property of another." Key Realty argues that the majority erroneously concluded that the noncompete agreement is unenforceable as a matter of law (as discussed above, we agree) and, therefore, the majority committed obvious error when it failed to consider the merits of this claim due to its erroneous belief that the noncompete agreement is invalid. In addition, Key Realty argues that the majority overlooked evidence in the record that creates a genuine dispute of material fact. We agree.

{¶ 104} It is an affirmative defense to R.C. 2913.04 that "[a]t the time of the alleged offense, the actor, though mistaken, reasonably believed that the actor was authorized to use or operate the property." *See* R.C. 2913.04(E) and R.C. 2913.03(C)(1)

48.

(the affirmative defenses listed in R.C. 2913.03(C) are applicable to a charge under R.C. 2913.04).  Despite the trial court's conclusion that appellees were "unwavering" in their position that Hall owned the records, the noncompete agreement that Hall signed specifically provided otherwise.  And Hall's deposition testimony on this point was equivocal (he first conceded that the agreement was "very clear" that the records belonged to Key Realty, but then said he misspoke.).

{¶ 105} But even setting that aside, Hall's position—that he believed Hall's LLC owned the property—is itself a credibility issue.  "If an issue is raised on summary judgment, which manifestly turns on the credibility of the witness because his testimony must be believed in order to resolve the issue, and the surrounding circumstances place the credibility of the witness in question—for example, where the potential for bias and interest is evident—then, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness." *Killilea v. Sears, Roebuck & Co.,* 27 Ohio App.3d 163, 167, 499 N.E.2d 1291 (10th Dist.1985).  A jury should determine whether Hall's position is credible and, if so, whether his belief was reasonable under the circumstances.

{¶ 106} We therefore grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim for unauthorized use of computer, cable, or telecommunication property, and we remand that claim for further proceedings.

49.

## 2. Civil Theft (against all appellees)

{¶ 107} Under R.C. 2307.61(A), a property owner may recover damages in a civil action from a person who commits a theft offense. A "theft offense" is defined in 2913(K)(1) to include a violation of R.C. 2911.01, 2911.02, 2911.11, 2911.12, 2911.13, 2911.31, 2911.32, 2913.02, 2913.03, 2913.04, 2913.041, 2913.05, 2913.06, 2913.11, 2913.21, 2913.31, 2913.32, 2913.33, 2913.34, 2913.40, 2913.42, 2913.43, 2913.44, 2913.45, 2913.47, 2913.48, 2913.51, 2915.05, or 2921.41. Key Realty does not specify in its complaint which theft statute appellees allegedly violated, but we assume that the theft offense alleged here is R.C. 2913.04 (unauthorized use of computer, cable, or telecommunication property). Given our conclusion that a genuine issue of material fact exists as to Key Realty's claim for unauthorized use of computer, cable, or telecommunication property under R.C. 2913.04, we reach the same conclusion with respect to its civil theft claim for the reasons articulated above.

{¶ 108} We therefore grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim for civil theft, and we remand that claim for further proceedings.

## 3. Extortion (against Hall)

{¶ 109} Under R.C. 2905.11(A)(1), "[n]o person, with purpose to obtain any valuable thing or valuable benefit * * * shall * * * [t]hreaten to commit any felony." The trial court rejected this claim by characterizing Hall's conduct—agreeing to return Key Realty's property in exchange for its agreement to rescind the noncompete agreement—

50.

as merely an intent to negotiate with his former employer, using items he owned as leverage. In *Key Realty I*, the majority agreed with the trial court's reasoning. In its motion for reconsideration, Key Realty argues that the majority committed obvious errors of fact and law. That is, the majority's opinion was premised upon its conclusion that Key Realty could not establish a theft offense given that Hall—not Key Realty—owned the disputed property. As we have already discussed, we agree with Key Realty that this was an obvious error because it ignored material evidence in the record—namely, the terms of the enforceable noncompete agreement—that created a genuine dispute regarding the ownership of that property.

{¶ 110} Accordingly, to the extent that Hall threatened to continue to deprive Key Realty of property that belonged to it (i.e., engage in a theft offense) if Key Realty would not agree to release him from his noncompete agreement (i.e., a valuable benefit), we find that a question of fact exists regarding whether Hall's conduct rose to the level of extortion. We therefore grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim for extortion, and we remand that claim for further proceedings.

{¶ 111} In sum, we find Key Realty's seventh assignment of error not well-taken with respect to the criminal mischief claim, but well-taken in all other respects.

51.

### H.  Eighth Assignment of Error:
### Spoliation (against Heather)

{¶ 112} Key Realty contends that appellees spoliated evidence when they deleted posts and removed group members from the Key Realty Columbus Facebook page.  The trial court concluded that there is no evidence of "willful" destruction of evidence, nor is there any evidence of "actual disruption" of Key Realty's case.  In *Key Realty I*, the majority agreed with the trial court.  In its motion for reconsideration, Key Realty argues that the majority's conclusion—with respect to Heather, specifically—contains obvious errors of fact and law.[2]  That is, the majority did not consider the definition of "willful" for purposes of a spoliation claim.  In addition, Key Realty argues that the majority failed to recognize that appellees' conclusory assertion that Key Realty has no evidence to prove its case was insufficient to meet their initial burden with respect to their motion for summary judgment on this claim against Heather.  We agree.

{¶ 113} In the trial court, Key Realty offered as an exhibit a log printed from the Facebook page in support of its spoliation claim.  It shows that on the day the trial court ordered Hall to return control of the page to Key Realty (the day after the action was filed), Heather—before returning control to Key Realty—deleted 19 posts (including posts by Hall and Fairchild) and removed numerous individuals from the group.

---

[2] Key Realty does not ask us to reconsider our conclusion in *Key Realty I* that it failed to establish a claim for spoliation against the other appellees.

{¶ 114} Heather described the Facebook page as a forum for agents to ask questions and she conceded that she, Fairchild, and her husband had responded to questions posed by agents on the page. Heather denied that she deleted the posts to conceal the fact that they had recruited Key Realty agents to work for Red 1, but she claimed that she could not remember the content of the posts she deleted or why she deleted them. She acknowledged that she was aware that the lawsuit, including the TRO, had been filed.[3]

{¶ 115} Under Ohio law, "[a] cause of action exists in tort for interference with or destruction of evidence." *Smith v. Howard Johnson Co.,* 67 Ohio St.3d 28, 615 N.E.2d 1037 (1993). "The elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Id.*

{¶ 116} Here, litigation had been initiated against Hall and Red 1—a company that Heather co-owned. Heather was aware of the litigation—she was the statutory agent

---

[3] Heather claimed in a September 10, 2019 affidavit that she first learned that a TRO had been granted sometime after 5:30 p.m. on January 16, 2019—after she finished purging Facebook posts—and she was not initially named in the suit. Significantly, she does not deny that she was aware that the litigation had been initiated against her husband and Red 1 (which she co-owned) and that control of the Key Realty Facebook page was at issue in the litigation.

53.

for Red 1 and her husband was a defendant. Thus, the first two elements of the claim are easily satisfied. It is primarily the third, fourth, and fifth elements at issue here.

{¶ 117} As to the third element, willful destruction designed to disrupt the plaintiff's case, to prove this element, a plaintiff must show that a defendant willfully destroyed evidence. *See, generally, Elliott-Thomas v. Smith*, 154 Ohio St.3d 11, 2018-Ohio-1783, 110 N.E.3d 1231. Willfulness "'reflects an intentional and wrongful commission of the act.'" *Heimberger v. Zeal Hotel Group, Ltd.,* 2015-Ohio-3845, 42 N.E.3d 323, ¶ 37 (10th Dist.), quoting *White v. Ford Motor Co.,* 142 Ohio App.3d 384, 387, 755 N.E.2d 954 (10th Dist.2001).

{¶ 118} Here, Heather testified that to remove the Facebook posts and group members, she pressed the "delete" button; she believes that once deleted, a post cannot be retrieved. While she denied that her purpose was to conceal evidence that she or her husband solicited Key Realty agents to work for Red 1, she said that she does not know why she did it. We conclude that this testimony creates a genuine issue of material fact as to whether Heather willfully destroyed evidence. *See Abbott v. Marshalls of MA, Inc.,* 8th Dist. Cuyahoga No. 87860, 2007-Ohio-1146, ¶ 25 (finding "willful destruction" element met where employee taped over video footage depicting purported shoplifting incident in violation of store policy, noting that such conduct did not appear to be "merely coincidental").

54.

{¶ 119} As to the elements of disruption and damages, Heather failed to meet her burden of establishing that no genuine issue of material fact exists. Heather's summary-judgment motion stated only as follows:

> The evidence now before this court establishes beyond genuine dispute that none of the Red 1 Defendants can be held liable for the tort of spoliation of evidence. Heather Hall and Ken Fairchild testified in their depositions that they did nothing that constitutes the tort of spoliation of evidence. And there is no evidence to the contrary.

{¶ 120} The Ohio Supreme Court in *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996) held that "a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." The court explained that "[t]he moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." (Emphasis in original.) *Id.* "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied."

55.

{¶ 121} Here, there is evidence that Heather willfully destroyed evidence, and she offered only conclusory assertions to dispute the remaining elements of Key Realty's spoliation claim. These conclusory assertions are insufficient to entitle her to summary judgment.

{¶ 122} We therefore grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's against Heather for spoliation, and we remand that claim for further proceedings. We find Key Realty's eighth assignment of error well-taken with respect to the spoliation claim against Heather, but not well-taken with respect to its spoliation claims against the remaining appellees.

## I. Ninth Assignment of Error:
### Civil Conspiracy (against all appellees)

{¶ 123} Finally, there are genuine disputes of material fact relating to Key Realty's civil conspiracy claim. The tort of civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995). An underlying unlawful act is required before a party can prevail on a civil conspiracy claim. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

{¶ 124} Here, the ultimate factfinder should have the opportunity to determine whether appellees (despite their protestations to the contrary) acted in concert to injure Key Realty through such unlawful acts as tortious interference with contract and business

56.

relations, unfair competition, unauthorized use of computer, cable, or telecommunication property, theft, and extortion—all of which claims should be resolved at trial. As we have concluded, the *Key Realty I* majority made obvious errors of law and fact when affirming summary judgment on these underlying claims. Because summary judgment on the underlying claims was erroneous, summary judgment on the civil conspiracy claim is also inappropriate.

{¶ 125} We therefore grant Key Realty's motion for reconsideration on this issue, we reverse summary judgment on Key Realty's claim for civil conspiracy, and we remand that claim for further proceedings. We find Key Realty's ninth assignment of error well-taken.

## IV. Conclusion

{¶ 126} We agree with Key Realty that the majority decision in *Key Realty I* contains obvious errors of fact and law, and that it failed to consider several issues that should have been considered. We, therefore, grant its motion for reconsideration, vacate our decision in *Key Realty I*, and deny as moot Key Realty's motion for consideration en banc.

{¶ 127} We find Key Realty's first, third, fifth, eighth, and ninth assignments of error well-taken. We find its second assignment of error not well-taken. We find its fourth, sixth, and seventh assignments of error well-taken, in part, and not-well-taken, in part. As to its fourth assignment of error, we affirm as to the dismissal of that part of Key Realty's claim for tortious interference with contract that relates to interference with

57.

alleged contracts between Key Realty and its agents, but otherwise, we reverse. As to its sixth assignment of error, we affirm the dismissal of Key Realty's criminal-mischief claim, but otherwise, we reverse. And as to its seventh assignment of error, we reverse as to the dismissal of the spoliation claim against Heather, but otherwise, we affirm.

{¶ 128} We reverse, in part, and affirm, in part, the October 15, 2019 judgment of the Lucas County Court of Common Pleas and remand this matter to the trial court for proceedings consistent with this decision. Appellees are ordered to share equally in the costs of this appeal under App.R. 24.

Reconsideration granted;
judgment reversed, in part,
and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                                                  _____
JUDGE

Gene A. Zmuda, P.J. 
CONCUR.

_____
JUDGE

Thomas J. Osowik, J. 
DISSENTS AND WRITES
SEPARATELY.

**OSOWIK, J.**

{¶ 129} I respectfully disagree with the new majority's decisions to grant reconsideration and to deny en banc consideration in this matter.

58.

{¶ 130} Appellant argues reconsideration is warranted because this court's opinion is contrary to *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, syllabus, where we allegedly failed to "acknowledge, analyze, or fully consider *Lake Land's* holding and analysis." Contrary to appellant's argument, this court addressed *Lake Land* and found Mr. Hall was never appellant's at-will employee. *Key Realty, Ltd. v. Hall*, 6th Dist. Lucas No. L-19-1237, 2021-Ohio-26, ¶ 42. Appellant further argues reconsideration is warranted for each of its nine assignments of error. However, appellant presents no arguments for our consideration that were not presented in its direct appeal and considered by this court. Rather, appellant urges this court to "adopt the analysis" of the dissenting opinion to simply reach a different conclusion. "An application for reconsideration is not designed for use in instances where a party simply disagrees with the conclusions reached and the logic used by an appellate court." *Perrysburg Twp. v. City of Rossford*, 6th Dist. Wood Nos. WD-02-010, WD-02-011, 2002-Ohio-6364, ¶ 4, quoting *State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956 (11th Dist.1996). By the new majority in this decision merely adopting the dissenting opinion to this court's opinion, they are improperly rewarding appellant for simply disagreeing with the conclusions reached and the logic used by the majority decision of this court.

{¶ 131} However, given the reversal to this court's decision the new majority grants in its decision to grant reconsideration, then an intradistrict conflict exists and an en banc proceeding is warranted.

59.

**{¶ 132}** "An en banc proceeding is one in which all full-time judges of a court who have not recused themselves or otherwise been disqualified participate in the hearing and resolution of a case." *State v. Forrest*, 136 Ohio St.3d 134, 2013-Ohio-2409, 991 N.E.2d 1124, ¶ 7, citing App.R. 26(A)(2)(a) and *McFadden v. Cleveland State Univ.,* 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, ¶ 10. The purpose of en banc proceedings is to resolve intradistrict conflicts of law, i.e., conflicts that arise within a district, and "promotes uniformity and predictability in the law, and a larger appellate panel provides the best possible means of resolution." *Id.*

**{¶ 133}** "Courts of appeals have discretion to determine whether an intradistrict conflict exists. * * * An abuse-of-discretion standard applies to decisions on whether to grant en banc proceedings." *McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, ¶ 19.

**{¶ 134}** For the foregoing reasons I respectfully dissent and would deny appellant's application for reconsideration because it does not call to our attention an obvious error or raise an issue for consideration that was not considered when it should have been. Further, because of the new majority's decision granting reconsideration, I find it is within this court's discretion to grant appellant's application for en banc consideration to resolve an intradistrict conflict.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.